**UNITED STATES v. GENERAL MOTORS CORPORATION et al.**

No. 7146.

Circuit Court of Appeals, Seventh Circuit.

May 1, 1941.

Rehearing Denied July 2, 1941.

---

For order overruling a demurrer to the indictment, see 26 F.Supp. 353.

John Thomas Smith and Henry M. Hogan, both of New York City, E. S. Ballard, of Chicago, Ill., and S. J. Crumpacker, of South Bend, Ind., for appellants.

Holmes Baldridge and Edmond J. Ford, both of Washington, D. C., for appellee.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This is a criminal prosecution for a conspiracy to restrain interstate trade and commerce in violation of § 1 of the Sherman Anti-Trust Act. 26 Stat. 209, 50 Stat. 693, 15 U.S.C.A. § 1. The jury rendered a verdict acquitting all of the individual defendants and finding the four, corporate defendants guilty. This appeal is taken from the judgment entered upon the verdict fining each of the corporate defendants in the amount of $5,000.[1]

The errors relied on arise out of the overruling of the demurrer to the indictment, denial of a bill of particulars, denial of a motion to dismiss at the close of the Government's opening statement, rulings on evidence, failure to grant defendants' motions to direct a verdict, instructions to the jury, and refusal to grant a new trial.

A. Theory Upon Which Case Tried.

1. Indictment. In essence the indictment charges that the defendants conspired to restrain unreasonably the interstate trade and commerce in Chevrolet, Pontiac, Oldsmobile, Buick, LaSalle and Cadillac cars; that their purpose was to control the financing essential to the wholesale purchase and retail sale of General Motors cars; and that in furtherance of this purpose the conspirators devoted themselves to concerted action by which GMAC financing

---

[1] For convenience names of the corporate defendants will be abbreviated as follows: General Motors Corporation—GMC; General Motors Sales Corporation—GMSC; General Motors Acceptance Corporation—GMAC; General Motors Acceptance Corporation of Indiana—GMAC (Ind.).

On May 27, 1938 the grand jurors in and for the Northern District of Indiana returned an indictment against the corporate defendants and 19 individuals alleged to be officers, employees and agents of the four corporations. During the pre-trial stage of the case a demurrer to the indictment was overruled, D.C., 26 F. Supp. 353, a motion for particulars was denied, and the indictment was dismissed as to two of the individual defendants.

The trial commenced on October 9, 1939. At the close of the government's case, on October 24, 1939, a motion to dismiss the indictment and to direct a verdict of not guilty was denied. At the close of the defendants' case, on November 15, 1939, a similar motion was made and denied. The jury returned its verdict on November 17, 1939, motions in arrest of judgment and for new trial were denied on November 18, 1939, and judgment was entered upon the verdict.

The reading matter on appeal is voluminous: record—4,566 pages; digest of evidence by corporate defendants—244 pages; digest of dealer evidence by the government—42 pages; briefs by corporate defendants—437 pages; briefs by the government—178 pages.

was imposed on dealers who were engaged in the purchase and sale of the above described cars.

Paragraphs 1 to 27 of the indictment explain the general background of the automobile industry including the manufacture of automobiles and their sale and financing at wholesale and retail. In particular it is alleged that GMC manufactures its products at plants in seven states and sells them through GMSC at wholesale to approximately 15,000 dealers located in all of the states. The dealers in turn sell these new automobiles, as well as used automobiles on hand, to retail purchasers. Generally the retail transactions are "time sales" where part of the price is paid in cash, a used car is taken in trade and the remainder of the price is paid in installments. The practice in the industry is to require dealers to pay cash before receiving the new cars, so that normally title and possession pass from the manufacturer or selling agent when the cars are transported and shipped from the factory. The wholesale and retail price of automobiles is high, and usually the dealer and retail purchaser are unable to pay on a cash basis. Consequently a large supply of money is regularly and continuously needed, so much so that it is absolutely necessary in most instances to finance (1) the wholesale purchase of the new car, (2) the retail sale of the new car and (3) the re-sale of the used car. As a result, approximately 375 independent finance companies and GMAC find themselves competing for the financing of these transactions. This financing is indispensable to the free movement of automobiles from the factory to the dealer as well as from the dealer to the ultimate purchaser.

Paragraphs 28 to 33 of the indictment describe and name the corporate and individual defendants, and paragraph 34 charges them with a conspiracy to restrain unduly the interstate trade and commerce in General Motors automobiles. Paragraph 35 states that the purpose of the defendants was to monopolize and control the business of financing the trade and commerce in new and used General Motors automobiles. Paragraph 70 alleges that dealers have complied with the defendants' coercive plan in order to save substantial investments in their businesses, paragraph 71 states that the effect of the conspiracy has been to restrain and burden unreasonably the interstate trade and commerce in

General Motors automobiles, and paragraph 72 is a restatement of paragraph 34.

The specific conduct embraced within the illegal concert of action is described in paragraphs 36 to 67 of the indictment and may be summarized as follows: (1) Requiring dealers to promise to use GMAC exclusively as a condition to obtaining a franchise for the sale, transportation and delivery of automobiles; (2) Making contracts for short periods and cancellable without cause, canceling or threatening to cancel such contracts unless GMAC facilities are used; (3) Discriminating against dealers not using GMAC by refusing to deliver cars when ordered, delaying shipment and shipping cars of different number, model, color and style; (4) Compelling dealers to disclose how they finance their wholesale purchases and retail sales, examining and inspecting dealers' books and accounts in order to procure this information, and requiring dealers to justify their using other financing media; (5) Giving special favors to dealers using the wholesale and retail facilities of GMAC; (6) Granting special favors to GMAC which are denied to other discount companies; (7) Giving dealers a rebate from the GMAC finance charge paid by the retail purchaser, in order to induce use of GMAC financing facilities; and (8) Compelling dealers to refrain from using other finance companies by all other necessary, appropriate or effective means.

2. Opening Statements. The opening statements made by counsel in the trial of this case, throw considerable light upon the primary issues and make the respective positions of the parties stand out plainly. For this reason pertinent portions therefrom are either quoted or paraphrased substantially in the paragraphs that follow.

Government counsel stated that the gist of the conspiracy alleged in the indictment was "to restrain and interfere with the right of General Motors dealers to finance cars sold by them in whatever manner they see fit," to deny them "the right to finance the sales of their cars with whomever they see fit," and "to force 15,000 independent business men" to use the financing facilities of GMAC. He added that the motive actuating the conspirators was "profit. They wish to secure as much of the financing business as possible * * * [because it] is a profitable business." Then he concluded that the

object in prosecuting the defendants was "to restore to a class of independent business men, namely, 15,000 General Motors Dealers, a right to conduct their automobile business in the way that they see fit."

Counsel for defendants expressed the following thesis: "From the very beginning and over a period of 20 years the original conception of GMAC * * *, the development of it and the way it is administered, is all for the purpose of selling automobiles and never for the purpose of making money out of the financing business." He reasoned that everything done by the General Motors family was directed toward one end, the manufacture and sale of General Motors automobiles. In this connection it was necessary to establish GMAC "as a merchandising aid for General Motors as a producer and seller of automobiles," because there were "variable and exorbitant charges being made by miscellaneous independent companies" and because General Motors goodwill faced "the risk of being wiped out by abuses in connection with financing in the case of time sales." This necessity has continued and increased, for now there are "some 175 independent finance companies who are interested in only one thing, and that is in making money out of finance." He pointed to the history of GMAC as conclusive evidence that its purpose was to "implement the selling of General Motors cars" or to serve as a "selling tool, a means of getting more General Motors automobiles in the hands of time purchasers throughout the United States."

3. Statements During Trial. At one period counsel for the Government stated "the theory of the case is that the defendants are forcing their dealers to use a particular type of financing, although there may be various other types available," and counsel for defendants replied "our defense is that we are not forcing them, but they are using it because it is better."

When the defense sought to adduce evidence relating to rates and practices of independent finance companies, counsel for the Government objected because the "government's case is predicated on the dealer's right to make his own choice of finance companies, and not on a fight between GMAC and other discount companies." In sustaining this objection the Court said that the jury in this case was neither "trying the respective merits of finance companies" nor deciding "whether a man would have been better off if he had accepted the facilities of another finance company other than GMAC."

4. Closing Arguments. Although the closing arguments of counsel for the defendants were not included in the record on appeal, some reference and answer thereto was made in the Government's summation to the jury.

Counsel for the Government told the jury that the prosecution had proved three elements, namely (1) conspiracy, (2) interstate commerce and (3) unreasonable restraint of trade. As to (1) he pointed out that the instant case presented a nation-wide conspiracy "to restrain the movement of General Motors cars in interstate commerce" by restraining the "dealer selling General Motors products in the * * * free running of his own business affairs." As to (2) he argued that General Motors cars were products in interstate commerce, being shipped from places of manufacture in seven states into the channels of trade across state lines and then being received and sold by 15,-000 dealers located in every state in the Union. As to (3) he reasoned that the concerted activity of the defendants, by which GMAC financing was imposed on independent dealers engaged in the purchase and sale of General Motors cars, unreasonably restricted trading in these automobiles.[2]

5. Instructions. The charge to the jurors was an explanation in simple narrative form of (1) the applicable law, (2) the indictment and (3) the evidence. The Court explained topics (1) and (2) and ended discussion thereof with the statement that "So the essential thing in this case * * * is that charge; a conspiracy to restrain * * * unreasonably the commerce from state to state in Gen-

---

[2] As stated by counsel, "The restraint of trade in this case is on the 15,000 General Motors dealers that have the right, under the terms of their contracts, to conduct their business as independent business men." He closed with the expression that "the sole interest of the government in this case is the restraint of free competition among General Motors dealers. We want to permit them to make up their own minds, without coercion, pressure, discrimination or fraud, as to the finance company with which they wish to do business."

eral Motors automobiles in violation of the Sherman Act." Presently the Court defined such terms as conspiracy, coercion, burden of proof and statute of limitations and instructed the jurors as to their consideration of "the question of conspiracy to restrict interstate commerce unduly and unreasonably."

Considerable attention was then given to topic (3) and also to the limits within which the defendants might promote GMAC. The Court pointed out that the defendants had the right to select any dealers they saw fit, determine upon what terms to sell General Motors cars, expound the advantages of GMAC and persuade dealers to use GMAC. But the Court added that they could not utilize existing and prospective contracts with dealers as "clubs or instruments" of coercion to compel acceptance of GMAC. As stated by the Court, "That almost is the fact question in this case, whether the dealer could act as a free man; whether he could act of his own free will." Of course, on this fact question the defendants contended "they never used force of any character to compel the dealers to use GMAC" and the Government contended the evidence indicates the contrary. In closing the Court emphasized that "if you find coercion exists, then the ultimate question is: Has it resulted in unreasonable restraint of interstate commerce. That is the question you must determine from all of the evidence."

Later the jurors requested further instruction of the Court and in particular they asked the following pertinent question: "If the evidence shows that they have coerced and conspired, would that mean that this conspiracy consisted of restraint of trade and commerce?" The explanatory answer contained two statements which merit deep consideration. The first of these struck at. the core of this case, that is, whether the theory underlying the indictment properly invokes the application of the Sherman Law:

"The Government says, and the charge in this indictment is, that this coercion [which prevented free action by the dealers in the selection of a financing company] * * * has resulted in a situation where the commerce in General Motors cars, the products of General Motors, from state to state, has been unreasonably and unduly restricted and restrained."

The second of these statements posed the problem which falls within the exclusive province of the jury: "The ultimate question, after all, is whether, under all the facts and circumstances the acts of coercion mentioned in the indictment * * * have been proved beyond all reasonable doubt, and, second, if they have been so proved, whether they, as a result, effectuated an unreasonable restraint on the interstate commerce in General Motors automobiles. If they effectuated a restraint, then you have got to determine, from all the facts and circumstances, whether it was an unreasonable restraint."

After these instructions and in the presence of the jurors, defense counsel requested the Court to charge that if the jurors find "that General Motors dealers have been restrained as a result of an agreement entered into among the defendants, effectuated by the acts alleged in the indictment, they should find the defendants not guilty, unless they also find that the interstate trade and commerce in General Motors automobiles which moves through the retail outlet which those dealers constitute * * * have been unduly restrained as a result thereof." The Court answered that the requested instruction was a correct statement of the law and that it already had been covered in the instructions to the jury.

### B. Evidence.

1. History of Corporate Defendants. GMC was organized in 1916 for the purpose of manufacturing and selling automobiles and other products, and is the largest manufacturer of automobiles in the United States and since 1928 has been conducting its operations through five motorcar divisions, namely, Chevrolet Motor Division, Pontiac Motor Division, Olds Motor Works Division, Buick Motor Division and Cadillac Motor Car Division. It is both an operating company owning the properties and assets of its motorcar divisions, and a holding company owning part or all of the capital stock of the other corporations connected with its activities.

GMSC was organized in 1936 for the purpose of selling automotive products. It is a wholly owned subsidiary of GMC and since 1936 has been functioning as the exclusive distributor and sole selling outlet of General Motors automobiles. Ac-

cording to the GMC-GMSC contract dated December 1, 1936, GMC sells its cars to GMSC and title thereto passes at the factory. GMSC is also divided into motor-car divisions corresponding to the various manufacturing divisions of GMC. For example, there is a Chevrolet Division of GMC manfacturing Chevrolet cars and a Chevrolet Division of GMSC selling Chevrolet cars to General Motors dealer outlets.

Prior to the creation in 1928 of motor car divisions as separate departments of GMC, the various makes of General Motors cars were manufactured by such corporations as the Chevrolet Motor Company of California and the Chevrolet Motor Ohio Company. And prior to the organization of GMSC in 1936, the Chevrolet Motor Company (of various states), Pontiac Motor Company, Buick Motor Company and Cadillac Motor Car Company acted as sales agencies for the various makes of General Motors cars sold to General Motors dealers. These separate entities, now no longer functioning, were wholly owned subsidiaries of GMC.

In 1919 the automotive industry was in its infancy and GMC was struggling with the problem of large scale production of its automobiles. It was handling a product the unit price of which was high, and to increase its volume and trade therein necessitated an extension of credit facilities to dealers and to ultimate purchasers. Since at that time few financing companies would loan money on automobiles, GMC created its own financing medium, GMAC, to finance the wholesale and retail sale of General Motors cars. In particular, GMAC was organized in 1919 for the purpose of supplying credit facilities to General Motors dealers purchasing cars at wholesale and to retail purchasers of new General Motors cars and of used cars of any make previously taken in trade by General Motors dealers. The original capital of GMAC was $2,000,000 and its surplus $500,000. Today GMAC has a net worth of $90,000,000. At all times GMAC has been a wholly owned subsidiary of GMC as well as a constant source of profit to it. From inception in 1919 through the year 1938 GMAC has made net earnings approximating $150,000,000 and its net income per year has increased from approximately $50,000 in 1919 to $12,000,-000 in 1938.

GMAC (Ind.) was organized in 1929 for the purpose of carrying on the same functions in the state of Indiana as GMAC conducts in the remaining 47 states in the Union. GMAC (Ind.) is a wholly owned subsidiary of GMAC.

The stock of GMAC (Ind.) is owned 100% by GMAC and the stock of GMAC and GMSC is owned 100% by GMC. These four corporations have interlocking directorates and the function of each is mutually complementary. Yet in the main these manufacturing, selling and finance activities operate on a highly decentralized scheme. Each manufacturing division of GMC and each selling division of GMSC conducts itself as an integral business with separate personnel and with its own distinct responsibilities. Of course this decentralization in operation and management is subject to central control with relation to a "coordination of policy and coordination of treatment" in the interests of GMC, but otherwise there is "great competition among the different divisions."

2. Car Production and Distribution. General Motors automobiles are sold through some 15,000 dealer outlets located in every state in the country. These dealerships constitute independent economic units with an invested capital owned by the dealers. All dealers operate under written franchise agreements entered into with GMSC, and they are required to have a substantial investment in buildings, parts, accessories and signs, and to provide ample space and personnel for the sale and servicing of cars. Prior to the organization of GMSC in 1936 these franchise agreements, universally in use throughout the automotive industry, were between the dealers and the respective subsidiary sales companies wholly owned by GMC.

The franchise contracts recite that they shall continue in force "until cancelled or terminated," but in practice it is customary to "renew" them each time a new model is introduced. They are made cancellable on short notice and without cause, and under them dealers are not considered agents or legal representatives of GMSC "for any purpose whatsoever." The dealers are required to keep a uniform accounting system, to permit audits of accounts and records by GMSC, and to furnish GMSC with certain estimates and reports, namely, an annual estimate, a monthly estimate, and a 10-day report. The annual estimate states in advance of

retail orders what the dealer's anticipated car needs by months for the coming calendar year will be. The monthly estimate states in advance of retail orders what the anticipated requirements for the following three months will be. The 10-day report shows retail sales of both new and used cars made during the period, new and used car stocks, and unfilled retail orders on hand at the end of the period. The franchise agreements do not require dealers to use GMAC financing services, nor do they refer to GMAC in any way.

It also appears that dealers are required to submit 30-day reports and monthly financial statements. The 30-day reports show the number of used cars junked or sold at retail, the number of new cars sold at retail for cash, and the number of new and used cars sold on time. The monthly financial statements cover operations for the preceding month and show the actual condition of the business. The 10-day reports, the 30-day reports and the financial statements are mailed to or otherwise received by the zone manager of the proper motorcar unit of GMSC. The data contained in these reports and statements are compiled and forwarded to the regional manager, who in turn makes a similar composite compilation pertaining to his territory and sends it to the General Sales Manager. All this data and information is consolidated, and in due time the final product represents a national picture on dealers' operations, a document of value to the central office of GMSC.

Obviously the efficiency of dealers is vital to the proper merchandising of General Motors automobiles and necessarily GMC and GMSC attach great importance to the retail outlets phase of the merchandising process. As a result GMSC exercises care in the selection of General Motors dealers and requires them to meet certain standards already described. The record also shows that many steps have been taken to improve and assist this dealer organization, e. g., the Dealer Council, the Dealer Relations Board, and schools of training for the dealership personnel.

In order to keep constant contact with the dealers, it is necessary for GMSC to maintain a large field organization. For instance, there are approximately 9,000 dealers selling Chevrolet automobiles in the United States and aproximately 5,000 employees in the field organization of the Chevrolet Division of GMSC. This field organization may be illustrated by the Chevrolet organization which is typical. The general sales manager is at the head of the Chevrolet Division of GMSC and under him are two assistant general sales managers. Under these two are nine regional managers, each of whom is in charge of a region comprising three or more states. Under each regional manager are approximately 45 zone managers, each in charge of a zone comprising a part of one or more states. Under each zone manager are field representatives or district managers, each of whom is assigned to a specific territory, usually a county or other small subdivision. These field representatives make frequent calls on dealers, inquire as to business and economic conditions, offer advice and suggestions, make periodical audits and collect data as required by the written franchise agreements, and in general obtain detail information concerning dealers' business operations.

Every year GMSC conducts a contract renewal meeting in each zone at which time all dealers within the zone assemble. After sales talks and formal speeches every dealer present is required to attend a series of personal interviews with representatives of various departments of GMSC such as the parts department and accessories department. At the meeting there is always a representative of GMAC and usually he is the last person the dealer must see before the final interview with the zone manager. In the final interview the dealer's car requirements for the coming model year are reviewed, normally the requirements for new cars are determined from previous dealer's experience and from "price class" and "weight class" registration,[3] and customarily on this basis the

---

[3] Price Class is a record of the number of cars sold in the different price ranges by manufacturers of all cars in the automobile industry. The price class figures show what part of the national car market any manufacturer secures. A dealer attains his price class when he

sells a certain percentage of cars. Nor does the volume of sales affect price class. If there is a market for 100 cars and Chevrolet sells 30, Chevrolet would be getting 30% of price class; if suddenly there is a business reversal and only a total of 10 cars of all makes are sold,

dealer orders his new cars. The dealer is required to secure the approval of each representative and to agree with the zone manager on the subject of car requirements, before the franchise contract is renewed.

Car production is projected a minimum of eleven months before the new model is announced to the public. GMC anticipates (1) the number of cars to be produced in the model year and determines (2) the ornamental and mechanical changes to be made in the new model. Decision as to (1), the initial factory estimate, is essential because the various plants relating to the primary, machining and assembling operations may need enlargement or expansion. In this connection GMC is assisted by GMSC in that the latter contributes a tentative production schedule which is based on an analysis of economic and automotive conditions in current and past periods, and on a compilation of data secured from General Motors dealers anticipating their car requirements for the new model season. Decision as to (2) is necessary because the engineering department must complete drawings for the parts that are in a car, the manufacturing department must prepare tools and plant facilities, and materials must be ordered. Thus, for eleven months prior to the new model announcement, GMC will be planning and preparing production for and actually producing such units of the new model as the motor, axle and transmission. Then, for the twelve months of the new model year, it will be producing finished cars on dealers' orders or offering them for sale to GMSC.

In addition to assisting GMC in estimating production, GMSC also assists GMC in regulating production. On the basis of the monthly estimate and the 10-day report and on an analysis of economic and automotive conditions in general, it obtains a projection of retail estimates for three months and compiles data pertaining to retail sales, unfilled retail orders and retail stock on hand. The various zone schedules or projections are consolidated into a national schedule or projection, and this in turn is sent to GMC. In this way production is closely matched up with the market situation for the three months following the date of the report, and production for the current month is regulated to conform with immediate market conditions. Except during the first month of production in the new model year when dealers' orders exceed the schedule of production, no car is assembled and made ready for shipment until each dealer's order arrives at the factory.

When dealers' orders exceed production, a situation which ordinarily occurs at the beginning of the model year, there is a car shortage and the problem of proper distribution becomes acute. It is normal in such event to allot the cars at hand by zones, with the consequent distribution of the cars to the dealers in each zone under the control of the zone manager. There is evidence that the zone manager utilizes the dealers' 10-day reports and that in distributing the cars he gives consideration to the economic conditions and seasonal activity in the area of the particular dealers, their unfilled retail orders and their stock on hand. Defense witnesses state that dealers' use of GMAC financing is never a factor in the distribution of cars.

When production exceeds consumer demand, a situation which sometimes occurs, there is an overstocking in the hands of dealers and a serious problem of adjusting car production to the market arises. There is evidence adduced by the defense that in such a situation there is overproduction in the sense that dealers may not have retail orders to match their wholesale orders upon which production at the factory is based. Ordinarily GMC and GMSC anticipate a slump in retail orders some two or three weeks before the individual dealers do themselves. At such times, despite dealers' wholesale orders already received, GMC seeks to curtail production of its cars.

3. Financing Sale of Cars. In the automotive industry financing is essential to the movement of automobiles from the

---

Chevrolet considers that it should sell 3 out of 10.

In determining a particular dealer's percent of price class, the percentage of actual sales of his product within the zone in which he operates, averaged over a ten-year period, is taken in its relation to total sales of all cars of the same price class during the same ten-year period, and the resulting percentage is applied to the dealer's local market potential as his minimum requirement. The same procedure is followed with respect to the sale of trucks, and this is known as Weight Class.

factory through the dealer to the buying public. The record discloses that GMAC and independent finance companies are competing for the business of financing the movement of General Motors automobiles, and that they are ready to supply funds to dealers who purchase cars at wholesale and to customers who purchase cars at retail. In this connection GMAC employs a large personnel and at frequent intervals field representatives visit General Motors dealers for the purpose of securing their finance patronage and of collecting data pertaining to their business operations.

GMAC maintains an organization which closely resembles the organizational structure employed by the sales units of GMSC. Two vice presidents are in charge of branch operations at the central office in New York, and under these two there are ten regional managers who are in charge of an area corresponding to that of the regional manager of the motorcar units of GMSC. Under each regional manager are ten or twelve branch managers who operate over an area corresponding to that of the zone managers of the motorcar units of GMSC. And under the branch managers are the territorial managers or field representatives who work in an area corresponding to that of the field representatives of the motorcar units of GMSC.

One of the vice presidents of GMAC is also stationed at the General Motors building in Detroit where he associates with GMSC officials and watches day by day trends in the distribution and mechandising of cars. The other vice president of GMAC also mixes with GMSC officials and discusses with them the propriety of any proposed changes in GMAC financing plans. These functions enable GMAC to adjust itself to new financing requirements, permit a close cooperation between GMAC and GMSC, and secure for GMAC as much business as possible.

The primary source of statistics relating to dealers is a report made out by the territorial managers of GMAC who call on all dealers at least once a month for the purpose of obtaining information pertaining to the number of cars sold at retail, the number sold on time, and the division of time sales as between GMAC and other discount companies. This information is recorded on Form 5154 and forwarded to the branch managers of GMAC where the data is reassembled on Form 5171 and in turn sent to the central office. In due time all this dealers' data is compiled, tabulated and made into a composite nation-wide report.

Every dealer electing to use GMAC wholesale financing facilities is required to give a blanket power of attorney authorizing a representative at the factory to execute in his behalf certain GMAC documents, namely, a trust receipt and a promissory note. This power of attorney is subject to revocation at will, and only authorizes the execution of the GMAC documents upon receipt of the dealer's signed order for the purchase and delivery of the cars for which the trust receipt and promissory note are to be given. It also appears that dealers electing to use GMAC financing services are required to have a franchise contract with GMSC and to file with GMAC a financial statement taken from their books of account. Dealers are ineligible for GMAC credit if their financial and business condition is not sound. In 1937 GMAC received financial statements from approximately 17,650 dealers and approximately 1,150 were marked ineligible. In 1938 the total number of financial statements received was about 15,000 and about 1,200 were marked ineligible.

Normally dealers choose to have the cars they purchase shipped by rail or truck-away. In the beginning most shipments were made by rail, and a considerable amount of rail shipment is still employed throughout the mountain states and the middle west. In 1929 shipment by truck-away became popular with the dealers, and this popularity has increased until now shipment by way of truck moves the greatest portion of the total business. Several factors have combined to produce dealers' preference for the latter means of transportation, namely, establishment of regional assembly plants cutting the distance from the factory to the dealer, the extension of highway facilities, and the permitting of more prompt and economic handling of cars.

When a dealer purchases a car from GMSC, he may avail himself of three financial plans or arrangements, namely (1) he may finance the car at the factory through GMAC; (2) he may finance it at the place of shipping destination through GMAC or some other discount company;

and (3) he may pay cash or give a check to GMSC for the car at the factory and before shipment. Plan (1) is the sight draft collection method, applies to rail and truck-away shipments, and is widely used by dealers. The giving of a blanket power of attorney is necessary before a dealer may use this plan. Plan (2) is the old rail or bill of lading collection method, applies to rail shipments, and is little used by dealers. Plan (3) may be called the cash method, applies to rail and truck-away shipments, and is little used by dealers.

If a dealer selects shipment by truck-away, he may avail himself of plans (1) or (3). If (3) is employed, he must first forward checks or pay cash to GMSC before the car is delivered to the trucking company. If (1) is used, that is, if credit arrangements are established with GMAC, three documents are executed at the factory: (a) a bill of sale conveying title to the car from GMSC to GMAC; (b) a trust receipt executed to GMAC in the dealer's name; and (c) a promissory note payable to GMAC for the invoice price of the car to be shipped. The GMAC documents are executed in the dealer's name by virtue of the blanket power of attorney already mentioned, a convenience adopted to obviate frequent trips to the factory by the dealer and to facilitate shipping by truck-away. The cars are then delivered to the trucking company for delivery to the dealer, the original documents are mailed to the appropriate branch office of GMAC and copies are forwarded to the dealer by mail. The dealer is obligated to make payment to GMAC within a short fixed period of time after the date of the draft. He may either pay for the invoice price of the car shipped, in which event GMAC cancels the trust receipt and promissory note; or if the dealer wishes to hold the car against future demand, the trust receipt is continued in effect, the dealer pays 10% of the purchase price, and the promissory note for the 90% is payable on demand. Under this system GMAC takes title at the factory and the dealer has possession of the car subject to the lien of the trust receipt held by GMAC as security for the note in the amount of 90% of the purchase price.

If a dealer elects to ship by rail, he may avail himself of the cash transaction, the sight draft collection plan or the bill of lading collection plan. The first two meth-

ods or systems were described adequately in the preceding paragraph. Under the latter plan, he may patronize GMAC or other discount companies. If he specifies the GMAC wholesale plan, the car is shipped to him on a sight draft bill of lading, the draft for 10% of the purchase price going to the local bank of the dealer's choice. Accompanying the sight draft and bill of lading are the GMAC trust receipt and promissory note. When the car arrives, the dealer pays the bank the 10% deposit called for by the draft, signs the trust receipt and note covering the balance, secures the bill of lading and then unloads the car. If, however, the dealer fails to specify the GMAC wholesale plan, the car is shipped to him on a sight draft bill of lading, the draft calling for 100% of the purchase price. When the car arrives, the independent discount company pays the amount of the draft and takes a mortgage note, the dealer secures the bill of lading and then unloads the car.

During the period from 1935 to 1938 approximately 75% of the dealers purchasing cars from GMSC (or its predecessor sales companies) used the power of attorney sight draft collection system. Under this system a dealer can not finance the car at the factory through a discount company other than GMAC. Instead he must (a) borrow the money from the discount company and pay GMSC in cash before shipment or (b) have the discount company upon delivery of the car pay off the invoice price owing to GMAC. Of course he may finance the car through other discount companies by ordering shipment under the old rail or bill of lading collection arrangement. During the indictment period from 1935 to 1938 approximately 25% of the dealers purchasing cars from GMSC did not use the power of attorney system but instead availed themselves of such methods as the cash transaction, the bill of lading collection plan and arrangement (a) mentioned above.

When a retail customer has made his selection of a car and desires to close the transaction on the basis of an installment contract, the dealer normally executes with the customer a conditional sales agreement for the deferred balance secured by such agreement. This balance is determined by deducting from the retail delivered cash price of the new car any cash payments,

as well as the allowance, if any, upon the trade-in of the customer's used car. To this balance is added a finance charge. The dealer usually assigns to GMAC or some other discount company his interest in the car and his interest under the conditional sales agreement. In turn the dealer receives from the finance company the face amount of the contract less the finance charge. If the car sold to the retail purchaser has been held by the dealer on a trust receipt in the wholesale transaction, the title of the dealer must be cleared of the lien of the trust receipt. This release is accomplished by paying off the wholesale loan, and securing the cancellation and return of the note and trust receipt.

In one respect the practice of GMAC differs from that adopted by all other finance companies. When dealers assign their conditional sales contracts to GMAC, they agree to repurchase the retail paper from GMAC in the event repossession by GMAC is necessary, but only upon re-delivery of the repossessed car. In other words GMAC is a recourse company and dealers using its credit facilities must make good to GMAC any losses occasioned by repossession of cars sold on time, whereas most of the other discount companies operate on a non-recourse basis, that is, they themselves bear the losses incident to repossessions.

In 1925 GMAC added a dealer's reserve to its regular finance charge, thus offsetting the recourse liability assumed by the dealer and meeting the competition of non-recourse companies in this regard. Since 1935 the reserve has been 20% of the total finance charge of new cars, and the finance charge has been 6% per year or ½ of 1% per month flat of the original unpaid balance. In a typical transaction where a retail customer buys a new car for $800, pays $300 down and wishes to have $500 financed, GMAC's finance charge for one year is $30. Out of this $30 finance charge, $6 would be set aside as dealer's reserve, credited to the dealer on the books of GMAC, and paid to him as soon as the retail customer liquidates his obligation. There is evidence that a dealer's reserve is not calculated on an actuarial basis, that the experience over a period of five years shows the reserve set up was twice the amount necessary to pay repossession losses, that it constitutes additional profit to the dealer and that it is so advertised to the dealer body.

4. Commerce in Cars. General Motors automobiles are manufactured at plants located in seven states, are sold and shipped from these states to some 15,000 independent dealers doing business in every state in the land, and are there resold to the public. The commerce in General Motors products is tremendous, the number sold for the years 1935 through 1937 averaging around 1,600,000 per year, and essential to the movement of by far the greater volume of these automobiles is the availability of credit facilities. GMAC finances approximately 65% of the General Motors cars sold to dealers on time and around 75% of the cars sold to retail purchasers on time.

GMC sells the cars it manufactures to GMSC, and title to the cars passes to the latter at the factory. In turn GMSC sells and ships these cars to the various dealers in accordance with the franchise agreements, and payment in cash is required at the factory and before shipment in all cases except where the bill of lading plan is requested. The record indicates that GMSC surrenders all interest in these cars at the factory and before shipment, title passing to the dealers or to GMAC for security purposes. Certainly this is true for 75% of the dealers, those who purchase cars under the power of attorney system. And of the remaining 25% many pay cash or its equivalent at the factory and hence secure title before shipment.

5. Plan and Program. Defense counsel admitted in the opening statement that "every possible effort is made to persuade the dealer to use GMAC, because it is better." He concedes in his main brief that there is "some direct testimony to the effect that the four corporations had an understanding that they would seek to induce dealers to use GMAC and * * * some direct testimony that the corporations did some of the things set forth in paragraphs 37 to 62 of the indictment." The pertinent evidence on this point is related below.

GMC first realized the importance of financing the commerce in automobiles in 1919, but at that time the position of the motorcar was not secure and discount companies were reluctant to loan money on automobiles except on exorbitant terms. Consequently GMAC was created to finance the wholesale and retail sales of General Motors cars, and from 1919 to 1925 it developed a retail plan of install-

ment selling based on dealer indorsement of retail paper (recourse liability), adequate down payment (approximately one-third of the selling price), and payment of the balance within a reasonable period of time (usually twelve months). Generally and briefly, the objections to non-recourse and to "extreme terms," that is, smaller down payments and longer terms, were that these features increased repossessions and losses incident thereto, enhanced finance charges and formed a "glut" on the used car market.

In the beginning GMAC did not receive cooperation from the various selling companies wholly owned by GMC and, in the words of one defense witness, they would not "do anything to compel our dealer organization to use our service, so we had to fight our own way." This attitude on the part of the selling companies soon changed and great progress was being made by this pioneer in the automobile financing field. In the meantime, however, the hesitancy of discount companies to loan money on automobiles had disappeared and by 1925 the competition in the field had increased to an alarming extent. Evidence adduced by the defense indicates that the GMAC rates were always lower or as low as the rates of other discount companies, yet despite this fact the longer term, the smaller down payment and the non-recourse feature offered by the other discount companies carried greater dealer appeal. For instance, a defense witness stated that late in 1924 the non-recourse companies started to compete for business in the territory covering Oregon, Washington and Idaho, that they were successful, and that they even "took a considerable amount of business away from us."

After GMAC had convinced the selling organizations of the utility of its time sales plan in the merchandising of General Motors automobiles, it encountered the competition above described and experienced great difficulty in selling its plan to the dealers. Hence it happened that in 1925 GMC, GMAC and the various selling organizations came to an understanding and agreed among themselves to promote GMAC in every way. And since the year 1925, to use the words of defense counsel in his opening statement, the corporate defendants (or their predecessors) have adhered firmly to the fundamental policy to make "every possible effort * * * to persuade the dealer to use GMAC, because it is better." The various forms this persuasion assumed, and the many means adopted to enforce this policy, will now be related.

Late in 1925 Chevrolet sales in southern California dropped to fourth place, the other cars outselling Chevrolet because they were being sold on a smaller down payment, longer terms and on a non-recourse basis. Moreover certain Chevrolet dealers had resorted to the facilities of non-recourse companies with the result that they were securing business at the expense of other Chevrolet dealers in the same area who were using the new GMAC sales time plan. There is evidence by a defense witness that the non-recourse company rates were considerably higher than the GMAC rates, but despite this fact the non-recourse company terms appealed to many dealers and to the purchasing public generally.

This situation in southern California disturbed the policy-making executives of GMC, GMAC and the Chevrolet Motor Car Company very much, presenting as it did the imminent disruption of the Chevrolet dealer body on the issue of GMAC versus non-recourse company financing. Although the scene of action was localized, the moment was a critical one and the final outcome one which would have great repercussions over the country. To use the language of one of the executives, they realized "that in all likelihood if it [non-recourse company financing by General Motors dealers] took root in Southern California, it would spread all over the whole United States." Consequently, the executives held a conference in Los Angeles in November of 1925 for the purpose of studying the crisis and of planning its immediate solution.

The executives agreed that the sound finance policy to follow was to prevent the establishment of non-recourse financing among its own dealers. An executive stated the policy in this way: "So as far as the General Motors Corporation was concerned, our great worry was about allowing the establishment by our corporation of a plan of financing that would go to the nonrecourse basis * * *, and the decision finally arrived at was that the corporation would not deviate from its policy, which required the sales department to do everything in their pow-

er to convince the dealers that any plan of financing that would cost the customer more than the GMAC rates was not a sound policy."

Government witness Coats, at that time regional sales manager in the Pacific Coast area for the Chevrolet Motor Company of California, testified as follows: "Mr. Grant [at that time General Sales Manager of the Chevrolet Motor Company, and a conferee at the executives' conference] said that it had been decided by these executives * * * that Chevrolet dealers on the Pacific Coast must use the General Motors Acceptance plan one hundred per cent on their retail paper, and that it was up to him now and to me to tell our dealers that, and if they didn't do it, we would get a dealer that would."

This statement was corroborated by the testimony of Government witness Dreves, zone manager of the Los Angeles zone for the Chevrolet Motor Company of California in 1925.

Obviously the executives were looking beyond the Los Angeles situation and planning in terms of nation-wide merchandising of General Motors products. They feared that if a finance policy based on non-recourse, lower down payments and longer terms were permitted to be used by General Motors dealers in southern California, "it would spread all over the United States and it would seriously jeopardize the whole installment plan of purchase, and we [the executives] felt, therefore, that we could not endorse that policy so far as General Motors Corporation was concerned." Grant admitted that the Los Angeles plan of action was to be carried in any part of the country where similar circumstances prevailed. In this general connection evidence relating to three dealerships is pertinent and is noted below.

In 1925 Robert A. Smith operated a Chevrolet dealership in San Francisco, financed his cars through his own finance company, and was making from $15,000 to $18,000 per month on the financing operations alone. Coats and Grant insisted that he give up the finance business, and directed him to use GMAC exclusively or suffer cancellation of his franchise contract. As a result Smith liquidated approximately $800,000 worth of retail paper with GMAC, and thereafter used GMAC financing facilities substantially 100%, i. e., "with the exception of the bad business" which GMAC would not accept.

In 1925 and 1926 W. J. Stolz sold Chevrolet cars in St. Louis, Missouri, financed his purchases and sales through an independent discount company, and until late 1925 had had no trouble with GMAC. In 1925 and 1926 representatives of the Chevrolet Motor Company visited him constantly and insisted that he use GMAC facilities. He refused until the zone or assistant zone manager of Chevrolet directed him to give GMAC all his paper with the explanation that Chevrolet expected 100% of their dealers to do business with GMAC and that it was only a matter of time before all Chevrolet dealers would have to use GMAC.

In 1925 and 1926 Thayer K. Morrow operated a Chevrolet dealership in Peoria, Illinois. Until late in 1925 he had financed some of his business through an independent discount company, but sometime in 1926 he turned to GMAC exclusively. He attributed this change in financing to two conversations which occurred late in 1925 or early in 1926 after a speech made by Grant in Chicago, Illinois, in which Grant expounded and recommended the amended GMAC plan of 1925. The zone manager of the Chevrolet Motor Company told him "that GMAC was definitely a part of the picture and that we [the dealers] would be required to use it." In the second conversation the road man for Chevrolet in the Peoria district informed him "that if we [the dealers] wanted to get cars when the new models came out we had better play ball and use GMAC."

At any rate, pursuant to the agreed plan of action for the southern California area, Coats (the regional sales manager) instructed the sales managers of the Los Angeles, Oakland, and Portland zones that the dealers in their areas must use GMAC financing facilities. In addition he issued bulletins to all Chevrolet dealers on the West Coast (including the states of California, Oregon, Washington, Montana, parts of Idaho, and the territory of Alaska), in which he called their attention to the new GMAC plan and stated that "it would be pleasing" if they financed the retail time sales of Chevrolet cars "on rates neither higher nor lower than the GMAC Plan suggests." Soon thereafter Dreves, the sale manager of the Los Angeles zone, advised his dealers that "our program was such that we would

require all of his [their] business to go on the GMAC plan."

It was not long after the executives' meeting before substantially all of the dealers in the southern California area were using GMAC credit facilities.

Since 1925 the cooperation between the parallel organizations of GMAC and GMSC has increased considerably and a detailed supervision over the business operations of dealers has been developed and maintained.

At periodical meetings zone managers (GMSC) are instructed to secure dealers' use of GMAC finance and branch managers (GMAC) are told to enlist the aid of GMSC representatives in procuring dealers' use of GMAC credit. Manuals are distributed to GMAC and GMSC personnel directing full cooperation in order to obtain dealers' patronage for GMAC, and the two sets of reports (the 10-day and 30-day reports made to GMSC, and the 5154 and 5171 reports made by GMAC) are inter-changed between the parallel organizations.

If GMAC records indicate that a particular dealer is not financing a sufficient percentage of his time sales with GMAC, the aid of the zone manager of the proper sales unit is requested. The zone manager has authority to cancel a franchise contract, subject to confirmation by the regional manager, and controls the distribution of cars in times of car shortage and in periods of overproduction. Thereafter, a representative of GMAC and the zone manager make a joint call on the dealer for the purpose of securing the additional patronage for GMAC.

Every year dealers attend contract renewal meetings where they are interviewed by GMAC representatives in connection with the manner of financing cars. Unless the dealers' use of GMAC has been satisfactory during the preceding year, he is unable to secure the approval of the GMAC representative. In such cases the signing of his contract is postponed indefinitely by the zone manager until such time as the dealer makes satisfactory commitments for the coming year with respect to financing with GMAC. In this connection, Government witness McClain, a GMAC branch manager at Houston, Texas, from 1931 to 1935, made the following statement: "There were times when we [the GMAC representative and the zone manager at the annual interviews with dealers] would point out * * * the fact that the zone manager felt that he could help the dealer if he would give the business to GMAC much more than he could help him in any other way."

Obviously, such evidence as related above tends to disclose the tremendous influence exerted by appellants over dealers with respect to their use of GMAC. Supporting this evidence are some 56 dealer or unit reports covering the operations of 10 dealerships for the period from 1929 to 1938. These reports are prepared by the field representatives of GMAC and summarize the results of visits made to dealers in connection with the solicitation of finance business for GMAC. They indicate whether the aid of the zone managers of the motorcar units is needed and whether the zone managers have made joint calls on the dealer with GMAC representatives. The following excerpts indicate the general nature of these reports.

Excerpts from dealer or unit contact reports on Elledge and Barcroft, Oldsmobile dealers at Granite City, Illinois, for certain periods in 1936 and 1937, follow:

"* * * We are receiving considerable cooperation from the unit [the Zone Manager of the Oldsmobile Division of GMSC] * * * but knowing Mr. Barcroft as I do, considerable more pressure will have to be brought in order to do us more good.

"Mr. Cole of Olds [the Zone Manager] was at Dlrs. * * * learned later from Cole that he rode DBR. hard today, even to the point of giving business to us, or if he wasn't satisfied to give up the contract.

"* * * I told Mr. Barcroft that we must have some retail business to compensate for the cost of handling wholesale sight drafts and before I could finish what I had in mind, namely of telling him that wholesale would not be available unless we did get retail, he informed me that he has a new Oldsmobile deal * * * which he will give to us."

Excerpts from dealer or unit contract reports on Verney J. Reynolds, Chevrolet dealer located at Allegan, Michigan, for certain periods in 1935 and 1936, read as follows:

"* * * Mr. Kleist, Chev. Dist. Mgr., was at dealers, and gave him a talking to

about not giving GMAC more business. * * * A. I. C. is meeting our rates at this dealers, and he is giving them the majority of his business for two reasons—non-recourse on most deals, and a preferred collection service on those he guarantees.

"* * * Mr. Reynolds requested his dealer reserve but I explained to him that since he had been giving considerable of his business to A. I. C. and that Chevrolet Motor Company were not entirely satisfied with the results of his operation because of the high receivables and lack of working capital, we would continue to hold his reserve * * * until such time as he showed a desire to cooperate with us."

Excerpts from dealer or unit contact reports on Bel-Park Motors, handling Oldsmobile at Chicago, Illinois, for certain periods in 1936, read as follows:

"* * * Unit [Oldsmobile Division of the Sales Company] assistance is about the only recommendation that I can offer now in an endeavor to get more of this profitable business.

"Found the dealers more willing to sit down and talk GMAC. * * * While they have the fear of the Unit in them at present, they freely admit that it is not their choice to sell GMAC."

There are other dealer or unit contact reports in the record, but the excerpts from reports shown above are indicative of their general nature.

In addition to the 56 dealer or unit contact reports, there is the testimony of 48 dealers from 18 states which related to discrimination and coercion practised by the appellants for the purpose of compelling dealers' use of GMAC wholesale and retail financing services. Of these 48 dealers, 38 were ex-dealers on May 27, 1938, the date on which the indictment was returned, and 10 were still in business as General Motors dealers. The testimony covered the years from 1919 to 1938, and no defense was offered as to any of the 10 present dealers or as to 18 of the ex-dealers.

Vaughn E. Dollahan was a Pontiac dealer at Urbana, Illinois, from 1935 to 1937. He desired to finance his wholesale purchases and retail sales through a discount company owned by a personal friend, but he was required to agree to use GMAC 100% as a condition precedent to securing his franchise contract.

C. C. Disher operated a Chevrolet dealership at Winston-Salem, North Carolina, from 1932 to 1936. He had accepted his franchise with the understanding that he would be allowed to finance through the Commercial Credit Company, but hardly a month had passed before the Chevrolet zone manager told him to use GMAC. Disher refused to use GMAC, whereupon his books were inspected and his contract cancelled, all within a period of two months after the acceptance of the franchise. Shortly thereafter he promised to use GMAC and consequently was reinstated. Later he discontinued the use of GMAC, the periodical inspection of books commenced and the GMAC representative observed that "if I [he] wanted to get along with Chevrolet I [he] had better use GMAC." At the contract renewal meeting the signing of his contract was postponed until he promised to give GMAC his business. In April of 1935, during a period of car shortages, he was again using Commercial Credit and was also having difficulty obtaining cars. At that time the Chevrolet zone manager, road man and accountant, told him that if he would use GMAC, he would receive cars "more promptly," and he was asked "Which do you think most of, your franchise or Commercial Credit?" Later the zone manager paid Disher another visit and said, "We broke one dealer in this town * * * and damned if we don't fix you. Your contract is cancelled." He then appealed his case to the general sales manager who extended his franchise for 6 months, requested him to "get lined up with GMAC and forget these differences," and informed him that they wanted him to use GMAC because the profits of that company helped to build cars cheaper. However, he continued to use Commercial Credit facilities and was soon cancelled as a Chevrolet dealer.

Roy Underwood was a Chevrolet dealer at Fairmont, Indiana, from 1926 to 1931 and at Gas City, Indiana, since 1932. He financed his purchases and sales through a local company in which he was interested as stockholder. In 1935 he was cancelled as a dealer, but later he was reinstated upon condition that he would comply with the five requisites of a "good Chevrolet dealer," namely, price class, weight class, orderly shop, genuine parts and GMAC finance. Underwood also attended a national dealers' meeting in 1934

where either the General Sales Manager or one of the regional sales managers made a speech in which he stated "that he had no use or patience * * * for a dealer that would not avail himself of the services of GMAC" and "that they needed the profits in GMAC, and he was not interested in filling the pockets of independent finance companies."

Jack N. McCrary was a Buick dealer at Cleburne, Texas, from 1930 to 1931 and at Waco, Texas, from 1931 to 1937. In 1934 there was a "continuous squabble" about not giving GMAC more paper, in 1935 GMAC held back McCrary's dealer's reserve and in 1936 GMAC withdrew his wholesale credit because of his failure to give GMAC a sufficient amount of retail paper. Consequently he organized his own finance company and started using CII., whereupon the Buick zone manager informed him that he was making a "big mistake" and that he "should go and get back with GMAC." Thereafter he experienced a great deal of trouble receiving the models he ordered, whereas other dealers in the area had no such difficulty, and later in 1937 he was given a written notice of cancellation.

Chester L. Blades operated a Chevrolet dealership in Elwood, Indiana, from 1933 to 1936. Late in 1934 he began to wholesale finance through other discount companies, at which time GMAC and Chevrolet representatives notified him that such an arrangement would not be "tolerated." Thereafter he was shipped cars of different model and design from those ordered, and in 1935 he was told that he must either "fall in line" with respect to using GMAC completely or give up his franchise.

Grant T. Munson was a Chevrolet dealer at Marion, Indiana, since 1935. In his first year in business he divided his wholesale and retail paper among thirteen local discount companies, whereupon he was advised by a Chevrolet representative that he would get along better if he used GMAC. At the 1936 contract renewal meeting the signing of his contract was postponed, and in 1937 his franchise was cancelled because he had not given as much business to GMAC as he had promised. Munson then appealed his case to the General Sales Manager, pleading that he did not want to lose the substantial investment he had made in buildings, parts and ac-

cessories. A ten-point program was agreed upon, and he was allowed to continue as a dealer. Point 8 read as follows: "Sell yourself to G.M.A.C.—Chevrolet would like you to use G.M.A.C."

Fred Emich was a Chevrolet dealer at Chicago, Illinois, from 1932 to 1936 and he owned his own finance company to facilitate his purchases and sales, a course of business conduct which displeased GMAC. He received unordered cars and trucks in 1933, and the city manager of Chevrolet informed him that shipment of unordered cars would cease as soon as he would give some of his time sales finance paper to GMAC. He gave GMAC around 10% of his business in 1934 and became acquainted with the visits of GMAC and Chevrolet representatives. The zone manager warned him at the 1935 contract renewal meeting to the effect that if he expected to continue as a Chevrolet dealer he had better use GMAC at least 50%. Again he experienced difficulties with Chevrolet. This time cars of wrong colors and models were shipped to him and unordered accessories in great quantities were forced upon him. In addition he was required to send blank checks to the factory before cars were shipped to him. He was told by the GMAC representative that these problems would disappear if he used GMAC. In 1936 Emich was given his "last warning," the zone manager telling him that he was going to make an example of Emich for his failure to use GMAC. Not long thereafter Emich was cancelled as a dealer, and he appealed to the president of General Motors where he pleaded that in a period of four years he had done a gross business of around $3,-000,000. The president of General Motors told him that he had been cancelled because he did not use GMAC, that it was the policy of the corporation to require dealers to use GMAC, and that if Emich would not agree to use GMAC it would be useless for the president of General Motors to discuss his reinstatement with the general sales manager of the Chevrolet Division of GMSC.

The dealer testimony selected and described above, presents a fair picture of all the dealer testimony in the record. It may be added that substantially all the dealers objected to recourse financing and that many of them criticized GMAC for accepting only the good paper, which constitutes the greatest portion of a dealer's

business, and for leaving the normally small volume of risky paper to be financed through other discount companies. In addition some of the dealers pointed out that in many cases adherence to GMAC deprived members of the retail public of the opportunity to drive General Motors cars. According to C. T. McGuire, Chevrolet dealer at East Point, Georgia, he told his purchasers that the carrying charges through the local Georgia Acceptance Company would be greater than through GMAC, but many purchasers could only buy a car on a small down payment and long terms, neither of which was available under the GMAC plan. According to F. L. Mendez, Pontiac and Buick dealer at South Bend, Indiana, a large number of people who desired to purchase his cars on time were employees of a local discount company, and hence it was easier to sell to them by using the facilities of their employer.

The matter stated in the preceding paragraph suggests the testimony of Grant, important defense witness and a conferee at the Los Angeles conference of 1925. Grant insisted at the executives' conference that the best way to meet the competitive situation in southern California was to permit the Chevrolet dealers to meet the terms of the competing discount companies. Grant even proposed that GMAC operate under both a recourse and non-recourse plan and that GMAC match the small down payments and long terms of the independent finance companies. As pointed out earlier, the decision of the executives was against Grant's proposal.

The statistical data in the record indicates clearly that GMAC does a tremendous amount of business and makes huge profits. Prior to 1926 the annual volume of business was below $300,000,000 and the annual net income was below $2,500,000 with net losses in 1919 and 1921. In 1926 the total volume of business done by GMAC was over $600,000,000 or an increase of approximately 225% as compared to the year 1925. In 1926 the net earnings of GMAC were over $5,000,000 or an increase of approximately 225% as compared to 1925. These figures have mounted steadily since 1926 until for the period between 1935 and 1938 the average volume of business per year was over $1,000,000,000 and the average net earnings per year were over $14,000,000. On the other hand the average volume of business per year for GMC, between the years 1935 and 1938, was over $1,400,000,000 and the average net earnings per year were over $200,000,000.

### C. Sufficiency of Evidence.

It is clear that the evidence in this case tends to show a conspiracy having as its purpose the control by appellants of the dealers' financing. Testimony by certain defendants relating to the executives' conference in 1925 would indicate that the understanding reached was to compel General Motors dealers to use GMAC terms. However this particular testimony runs counter to the story told by Coats and Dreves, and belies the very acts and things done by the appellants. The jury could have interpreted the testimony in the light of all the circumstances, and it was proper for the jury to rely on inferences naturally flowing from the whole evidence. Certainly the government made out a stronger case in this regard than did the party having the burden of proof in Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, and Vitagraph, Inc. v. Perelman, 3 Cir., 95 F.2d 142.

It is even plainer that the jury finding of coercion is supported by the evidence. The coercive practices were many and varied (not all detailed in this opinion), and directly aimed to compel dealer-purchasers to use GMAC in financing the wholesale purchase and retail sale of General Motors cars. These practices occurred often and with sufficient continuity to constitute a definite course of business conduct. Undoubtedly the jury was warranted in attaching the coercion label to the action thus adopted by the appellants.

Counsel point to the dealer testimony with emphasis and argue that it fails to present a nationwide picture of conspiracy and coercion. We confess that this argument carries some weight, especially if the record were confined strictly to the testimony scored. However the Government did not rest its case on dealer testimony alone, although in fact this particular class of evidence represented the experiences of 47 dealers located in 18 states and covering the period from 1919 to 1938. There is other evidence in the record, related briefly below, which could have impressed the jury as much.

The record shows that the appellants hold a dominant position in the automotive industry, GMC being the largest manufac-

turer in the United States and GMAC being the largest sales finance company in the world. On the other hand, every dealer owns one of the 15,000 dealerships located throughout the country, and his status is determined by the franchise agreement which is subject to annual renewal and to cancellation on very short notice without cause. Although every dealer is an independent business man, the supervision and control exercised by GMAC and GMSC over his business operations is almost as complete as if the dealer were an agent in all respects. Every dealer also acquires a substantial investment in buildings, cars, parts and accessories, and builds up good will in his community. Consequently a cancelled dealership leaves the appellants with one less retail outlet which can be replaced readily, but leaves the disenfranchised dealer without a business and burdened with his substantial investment in the liquidation of which he is likely to sustain a heavy loss.

In addition, the jury was not required to ignore the dealer or unit contact reports, nor to belittle the GMAC promotive pressure put upon all dealers at the contract renewal periods. The record leaves no doubt that the dealer body as a whole was made acutely aware and had knowledge of the set policy of the appellants with respect to use of GMAC financing facilities. The fear of cancellation or refusal to renew contracts was great, so much so that the dealer was reluctant to refuse the terms and policies dictated by the appellants.

We do not hesitate to hold that the jury findings of conspiracy and coercion are supported by the evidence. In fact we would have no difficulty, even on a de novo analysis of the record, to conclude that the appellants were in position to impose and did impose their will on the independent dealer-purchaser, not only as to how he was to conduct his business but also as to whether he would conduct it at all.

There is also a jury finding that the conspiracy and coercion effectuated a restraint on the commerce in General Motors automobiles. On this vital point the Government contended that the coercive and discriminatory course of business conduct pursued by the appellants, resulted in a restraint of trade because it tended to restrict the sale of General Motors cars

and hence interrupt the movement of cars from GMC to the ultimate car owner.

In the automobile industry the car and the finance service are complementary to each other, and these two items are involved in the large percentage of the wholesale and retail transactions that occur. In the wholesale market a dealer is the purchaser of both items, GMC and the other manufacturers compete for the car sale, and GMAC and some 375 discount companies compete for the sale of the finance service. In the retail market a member of the public is the purchaser of both items, General Motors dealers and the other dealers compete for the car sale, and GMAC and the other discount companies compete for the sale of the finance service.

If these markets were free from outside forces, i. e., if the traders thereon were competing freely, a retail purchaser who preferred a Chevrolet car and favored a local finance service, could secure the car from the Chevrolet dealer and at the same time purchase the service from the local discount company; and a General Motors dealer who favored a local finance service for personal or business reasons, could secure a car through GMSC and at the same time purchase the service from the local discount company.

Now it is quite impossible to consider the interdependent retail market and wholesale market as one apart from the other, for obviously without the retail sale there could be no wholesale transaction. Any restraints which affect the wholesale market necessarily must be reflected in the retail sales and, likewise, any restraints affecting the retail market necessarily affect the wholesale transactions. As a matter of logic, if GMC and GMSC limit Chevrolet dealers to resales financed through GMAC and if a retail customer fails to purchase a Chevrolet car because he is dissatisfied with GMAC terms, the Chevrolet dealer would lose a sale he would have made otherwise, and consequently there would be one less Chevrolet car ordered, sold or needed in the wholesale market.

In the instant case the coercion practised upon General Motors dealers assumed the form of various restrictions in the nature of tying limitations. For example, GMC and GMSC would postpone the shipment of cars ordered by a recalcitrant dealer unless he promised to use

GMAC. They would deliver unordered cars to such a dealer in an effort to make him use GMAC. They would threaten an established dealer with cancellation unless he complied with the GMAC policy. And in some cases they would refuse to sell cars to a dealer except on condition that he use GMAC. In addition, other restrictions are disclosed by the record. To illustrate, under the franchise contracts a Chevrolet dealer may not compete against other dealers outside his designated sales area, and he is prohibited from dealing in cars of competing manufacturers.

When the evidence is boiled down, it is seen at once that the appellants agreed among themselves not to do business with any dealer who would not purchase the retail and wholesale service from GMAC. At first the non-use of GMAC facilities would bring upon the dealer much outside interference with the smooth operation of his business, later the continued non-use of GMAC facilities would affect his ability to secure cars, and eventually it would endanger his very economic existence. In the usual case the recalcitrant dealer had become firmly established in his community and was operating a profitable business, when he was given the ultimatum either to use GMAC or to liquidate his business. It is no small wonder that ordinarily in such a case the dealer agreed to purchase the wholesale and retail service from GMAC.

■ We are convinced that the jury finding of restraint in General Motors automobiles is supported by the evidence. In fact the necessary and inevitable effect of the coercive conduct tended to produce two distinct restraints of trade, namely a restraint on the commerce in General Motors cars and a restraint on the commerce in instruments of credit. It is manifest that the compelled use of the GMAC service carried with it a corresponding non-use of the service of the other discount companies, and to that extent the competition of the 375 independent discount companies would be suppressed. The Government rested its case on the restraint in General Motors cars rather than on the restraint in instruments of credit, presumably on the theory that financing per se is local commerce and hence not within the pale of the Sherman law.

There is considerable evidence that many prospective customers of General Motors dealers were ineligible under GMAC terms or for business and personal reasons preferred to use the service of other discount companies. Obviously, if a customer was refused credit by GMAC or if he failed to purchase a General Motors car because he preferred another discount service, there would be a restraint of trade in General Motors cars, for the sale might have been consummated had the dealer and customer been free to use the service of other discount companies. Clearly the coercive and discriminatory practices employed by the appellants tended to reduce the supply of General Motors cars in the channels of trade, and did impede the free movement of that commerce from the factory to the ultimate car owner.

■ Counsel urge (1) that the coercion did not impede the movement of General Motors cars and (2) that even if a restraint could be shown, it would be a restraint on the commerce of the appellants. As to point (1) counsel point out that car sales increased during the indictment period, and state that GMC and GMSC are primarily interested in selling as many cars as they can. Apparently neither of these two arguments militate against evidence showing that the coercion did result in or tended to effectuate a restraint in General Motors cars. Knowing what sales were made despite the restraint does not help much, nor does the knowledge that a manufacturer desires to sell a maximum number of cars. Sometimes it is good business to sacrifice car sales in order to increase the sale of a complementary product or service.

The position of counsel on point (2) finds some support in the economics of the situation, but it does not square with the law in the matter. Through the years GMC has educated the public to think in terms of General Motors automobiles, and naturally GMC itself treats the movement of General Motors cars from the factory to the retail public as a unified transaction, and the central theme at all times is maintenance of the reputation of General Motors cars. This then is the economic background, but legally the situation is slightly different. General Motors cars cease to belong to GMC upon their shipment from the factory, and GMSC as well as GMC are separated from the ultimate car owners by intermediary sales to dealers, whom GMC and GMSC for rather obvious reasons have not seen

fit to make mere agents. Normally GMC and GMSC surrender all legal interest in General Motors cars upon shipment from the factory, and the dealer-purchasers who receive possession obtain a definite property interest therein at that time and place. Therefore, from the time the cars leave the factory until they reach the retail purchasers the commerce therein is the dealers' commerce.

The inevitable conclusion on this record is that although GMC and GMSC have rejected the dealer-agency system, they seek nevertheless to control and supervise the business operations of the 15,000 independent dealer-purchasers. No doubt it is proper for GMC and GMSC to promote manufacturer's goodwill and to protect the manufacturer against inefficient and unscrupulous dealers. See Pick Mfg. Co. v. General Motors Corporations, 7 Cir., 80 F.2d 641; cf. International Business Machines Corporation v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085. But there is a limit to how far a manufacturer may go to control the whole process of distribution. The jury found that the appellants had gone too far with their control plans, and we are inclined to approve and to indorse the jury finding.

The appellants justify their coercive course of business on the ground that the GMAC service is superior to that of its competitors, and because they fear that unregulated dealers' financing would promote such evils as packing, excessive repossessions and cut-throat methods of competition. They show that GMAC rates and terms are reasonable, that use of the GMAC service will assure dealers control of the used car market and that unscrupulous dealers freed of such tying restrictions would resort to packing and other perversive practices.

The evidence shows that the coercive conduct in question was not intended to discriminate against an inferior or unreliable finance service. Rather its entire force and effect was directed against any use of an independent finance service. Regardless of the quality of the independent finance service, the command to General Motors dealers was to use GMAC. And obedience to the will of the appellants resulted in additional sales of the finance service. But behind it all lay the might of GMC which had achieved a dominant position in the automobile industry as manufacturer of cars desired by dealer-purchasers and many members of the retail public. Of course, the utilization of the manufacturer's dominant position and the tremendous popularity of General Motors automobiles, among other things heretofore explained, made it possible for the appellants to force the sale of the related finance service.

In our opinion the only possible excuse for imposition of the finance restrictions lies in the reasonableness of the GMAC rates, and in this connection there is no contention that other discount companies can not meet the requirement. We also believe that if indeed the GMAC service is superior to other finance services, there should exist no need for forcing it upon dealer-purchasers and retail purchasers of General Motors automobiles. See International Business Machines v. United States, supra.

Nor is it reasonable to suppose that an established dealer would jeopardize his business investment and dealer's goodwill by patronizing unreliable discount companies or by indulging in fraudulent finance practices. It would appear, therefore, that the appellants deemed it necessary to force all dealers to use GMAC because some of them might otherwise resort to fraudulent finance methods. If this is the truth in the matter, we should think that the appellants would have been able to find a way to punish unscrupulous dealers without penalizing the others at the same time.

If in fact unregulated dealers' financing leads to widespread abuses in the retail sale of automobiles, a need indeed would arise for regulation and control in order to protect the public interest. It is doubtful whether regulation in this respect should be entrusted to the dominant manufacturers in the automobile industry, especially when they stand to gain by discriminatory treatment in favor of a few specified discount companies in which they have a private interest. If in truth some outside control of dealers' financing is necessary, it should originate with the legislators whom we may safely assume would center their first thoughts on the public good.

It is clear that the restrictions imposed in this case upon the financing of the wholesale and retail sale of General Motors cars, bear no reasonable relation to manufacturer's goodwill. Conceivably manufacturer's goodwill can be protected in many ways without coercing the dealers or suppressing the competition of other dis-

count companies. Obviously such restrictions go much farther than required to protect the manufacturer against unscrupulous and inefficient dealers, and tend to deposit suppressive weights throughout the entire course of the marketing process without any apparent advantage to the public. It has been shown that these restrictions result in many members of the retail public being deprived of an opportunity to purchase a General Motors car.

As matters now stand, some 15,000 dealers are graciously allowed to continue their business of purchasing and selling General Motors cars in return for their slavish obedience to the command of the appellants to use the GMAC finance service. We should not tolerate a control mechanism definitely calculated to make General Motors dealers independent in name only. The best security to the public lies in the immediate removal of the finance restrictions. Then the dealer-purchasers and retail purchasers of General Motors cars may choose the finance service they desire, and the discrimination against would-be purchasers of General Motors cars (those who are now ineligible under GMAC terms, dissatisfied with GMAC service, or desirous of using an independent finance service) would disappear.

### D. Applicability of Sherman Law.

Counsel admit that the movement of General Motors cars from the factory to the dealer is interstate commerce, argue that this commerce is the appellants' commerce, reason that the movement of the car from the dealer to the retail purchaser is local commerce, and insist that the only restraint charged in the indictment is the restraint in General Motors cars moving from the factory to the dealer.

We have already shown that the commerce involved is the dealers' commerce in General Motors cars or, stated in another way, the commerce of dealers' cars purchased in interstate commerce.

■ Paragraph 34 of the indictment charges a restraint on the "aforesaid trade and commerce among the several states" in General Motors automobiles. This language poses the question as to the extent of the commerce involved in the instant case. Defense counsel reason that the charging language confines itself to the movement of cars between the factory and the dealer, but we are convinced that the commerce alleged to have been restrained

encompasses the movement of cars from the manufacturer through the dealers to the retail public. For instance, the indictment describes the movement of General Motors cars from factory to public, shows the dealers' trade as consisting of the purchasing and selling of General Motors cars, and recites the conspirators' activity affecting the buying and selling elements of the dealers' business. The evidence adduced at the trial lends support to this construction of the indictment, telling as it does the story of the entire marketing process of General Motors automobiles from the time they leave GMC to the time they reach the retail purchaser. Moreover, the following requested instruction bears on what the defendants thought at the trial concerning the extent of the commerce involved: "* * * they [the jurors] should find the defendants not guilty, unless they also find that the interstate trade and commerce in General Motors automobiles which moves through the retail outlet * * * [has] been unduly restrained. * * *"

The Court approved the requested instruction and stated that its equivalence had already been given in the instructions to the jury.

■ Undoubtedly the movement of a car from a dealer to a retail purchaser in the same state is intrastate commerce, if considered as an isolated event or as a free transaction in and by itself. The whole picture from the evidence, however, shows a constantly moving flow of General Motors cars, planned and calculated to pass from GMC through GMSC through the dealers to the consumers, in a background where production is projected in advance of retail orders and later adjusted to retail consumption at the production end of the movement. Moreover, as we have already pointed out, the retail and wholesale phases of the commerce in General Motors cars are mutually dependent; restraints placed upon one phase of the commerce necessarily affect the other phase; and without the retail sale there could be no wholesale transaction. The true perspective is to be drawn from the whole picture, and the interstate commerce involved in this case is that from the manufacturer, through the dealers, to the ultimate consumer. Even assuming that the only interstate commerce involved is the movement of cars from the factory to the dealers, a restraint imposed upon the movement of cars from the dealers to the retail pub-

lic would necessarily affect the shipment and movement of the cars while unquestionably they are in interstate commerce, and consequently we need not really decide when the interstate commerce ends and that which is intrastate commerce begins.

■ As we have shown in part A, the Government tried this case on the theory that the defendants had conspired to restrain the dealers' interstate trade and commerce in General Motors cars by monopolizing the financing essential to the movement of those cars. As we have shown in part B, in the course of the trial, evidence was adduced which indicated the nature of the conspiracy, the purpose and object of the conspirators, the means adopted by the conspirators to carry out the conspiracy such as the coercion and discrimination relating to dealers' use of GMAC, the effect of these restrictions upon financing, and the role played by financing in the movement of automobiles from factory to public. As we have shown in part C, the jury resolved the disputed questions of fact against the appellants and we concluded that the verdict of conviction was supported by substantial evidence.

■ It is plainly inferable from the evidence, quite apart from the concrete acts and things done, that a conspiracy had been formed whose main object and purpose was to monopolize and to control to the greatest possible extent the financing of the trade and commerce in General Motors cars. That the appellants intended to monopolize this financing business is further shown by the acts and things done pursuant to the conspiracy, i. e., the overt acts of coercion and discrimination in connection with dealers' use of GMAC facilities. It is immediately observed that where the specific results of a conspiracy have been shown, the conspirators are presumed to have intended the natural consequences of their acts.

■ The evidence also disclosed that financing constitutes an essential element in the sale of General Motors cars in interstate commerce, so much so that it is indispensable to the free and easy movement of the cars from the factory to the dealer as well as from the dealer to the retail purchaser. Obviously any restrictions imposed upon the retail and wholesale financing of cars sold in interstate commerce, which unreasonably impede the free flow of these cars, violate the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note.

Nor does it matter that the financing is considered to be local activity per se, for it is well settled that the federal government may under the Sherman Act regulate local commerce which is intimately related to interstate commerce or local activity which obstructs or burdens interstate commerce. Loewe v. Lawlor, 208 U.S. 274, 301, 28 S. Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Bedford Cut Stone Co. v. Stone Cutters, 274 U.S. 37, 46, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Local 167, International Brotherhood v. United States, 291 U.S. 293, 297, 299, 54 S. Ct. 396, 78 L.Ed. 804. See also Shreveport Case, 234 U.S. 342, 351–352, 34 S.Ct. 833, 58 L.Ed. 1341; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Chicago Board of Trade v. Olsen, 262 U.S. 1, 35, 43 S.Ct. 470, 67 L.Ed. 839; National Labor Relation Board v. Jones & McLaughlin, 301 U.S. 1, 34–38, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

■ In the instant case GMC and the other conspirators made use of their monopoly over the supply of General Motors cars and their power over the economic fate of General Motors dealers, to force GMAC on dealer-purchasers and retail purchasers of General Motors cars, in effect tying the GMAC finance conditions and restrictions to the wholesale purchase and retail sale of General Motors cars. That this conduct constituted an unreasonable restraint on the dealers' interstate commerce and trade in General Motors cars has been shown in part C and will presently be emphasized again, the obstruction obviously operating at a time when the cars no longer belonged to GMC and were already moving in the channels of interstate commerce. See International Business Machines v. United States, supra; Radio Corporation v. Lord, 3 Cir., 28 F.2d 257. See also Dr. Miles Medical Co. v. Park & Sons Co., 220 U.S. 373, 403–407, 31 S.Ct. 376, 55 L.Ed. 502. Cf. Carbice Corp. v. American Patents, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; dissent, Federal Trade Commission v. Gratz, 253 U.S. 421, 441, 40 S.Ct. 572, 64 L.Ed. 993.

Unquestionably such a conspiracy as here shown violates the Sherman law, for it operates to force unreasonable terms and conditions upon independent traders and to impose control restrictions upon their trading, coercive conduct which necessarily burdens the interstate trade and

commerce in their product and unduly limits their liberty to do business in the interstate markets. See Binderup v. Pathe Exchange, 263 U.S. 291, 312, 44 S.Ct. 96, 68 L. Ed. 308; Loewe v. Lawlor, supra, 208 U.S. 293, 294, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann. Cas. 815; United States v. Patten, 226 U.S. 525, 541, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325.

Condemnation of such a conspiracy is inevitable, for the theory in back of the Sherman law is to protect the free movement of goods in interstate commerce against unreasonable restraints, to assure open interstate markets where traders may freely negotiate sales, and to preserve the normal competitive forces which otherwise might operate in these markets.

Counsel for the appellants rely heavily on Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, and insist that it renders the Sherman law inapplicable to our factual situation. The Apex case emphasizes market control as a prerequisite for the violation of the Sherman Act and holds that the only kind of restraint prohibited by the Act is that which involves some form of market control. Not only is market control present in the instant case, but a peculiarly pernicious form of it is exhibited.

This becomes apparent at once when it is observed that GMC occupies a dominant position in the automobile industry, that GMC commands the supply of General Motors cars, that GMC and GMSC control the economic fate of General Motors dealers and that the market for General Motors cars is really the dealers' market in the sense that the cars subject to the trade and commerce therein no longer belong to GMC. And in this connection it is to be noted that the result is a restraint of trade in General Motors cars, interference with the competitive forces that otherwise would control the marketing of General Motors cars and creation of a forced and artificial market for GMAC.

It is only because the appellants control the marketing of General Motors cars that they are able to condition the sale of dealers' cars, restrict the liberty of the traders dealing in General Motors cars and create a non-competitive market for GMAC. For that matter GMC has always dominated the market for General Motors cars to a considerable extent, but it was only when control of the marketing process was perfected by the appellants and was directed at the creation of an artificial non-competitive market for GMAC, that it extended beyond legitimate business demands and became a menace to the interests of the public.

Indeed it is difficult to imagine a more extensive or drastic form of market control than is shown by this record, extending as it did throughout the wholesale and retail phases of the marketing process and affecting as it did the movement of and trading in cars belonging to the dealers. Manifestly, the result constituted a definite restraint of interstate trade in General Motors cars. In fact, the trade in General Motors cars was suppressed entirely in instances where dealer-purchasers and retail purchasers would not or could not use GMAC, and the competition among General Motors dealers and the other dealers for car sales financed through independent finance companies was eliminated. In addition, there resulted a restraint on the commerce in instruments of credit and to that extent a suppression of competition by the independent discount companies.

Thus it is seen that the dealer-purchasers and retail purchasers of General Motors cars are deprived of the many advantages derived from free competition, and certain members of the public are even deprived of an opportunity to purchase a General Motors car, when they are prevented from financing these cars except on terms dictated by the appellants. It appears that the appellants have increased the sales of GMAC by methods contrary to the public interest. In the final analysis, the public has suffered as much at least as the appellants have gained.

This Court held in Pick Mfg. Co. v. General Motors Corporation, supra, that GMC's refusal to sell cars to dealers, except on condition that they agree to use General Motors replacement parts when repairing General Motors cars, did not constitute a violation of Section 3 of the Clayton Act, 15 U.S.C.A. § 14. Counsel for the appellants argue that the GMAC condition is as essential to the protection of manufacturer's goodwill as the parts condition in the Pick case.

We have already pointed out that the finance condition in this case bears no reasonable relation to manufacturer's goodwill and that goodwill can be protected in many ways without coercion of the dealers. International Business Machines v. United States, supra, 298 U.S. 139, 56 S.Ct. 701, 80 L.Ed. 1085. It is conceivable that the

owner of a General Motors car would blame GMC for the car's improper performance caused by a defective part, especially if he did not know the origin of the trouble, but it is improbable that he would blame GMC because he was dispossessed or defrauded by an independent finance company. The finance restriction operates on the retail purchaser as well as on the dealer, and the competing discount companies are unable to finance General Motors cars. The parts restriction in the Pick case operated on the General Motors dealer only, and the competition of other parts manufacturers was not completely destroyed.

We hold that the coercive course of action indulged in, falls within reach of the Sherman law.

### E. Other Matters.

■ 1. Single Trader. Counsel contend that the appellants are affiliated and non-competing units engaged in a single enterprise and hence they are in effect a single trader; that as a single trader they have a right to condition the sale of their product and to restrain their own product by selling it to whom they please; and that a combination of competing units is essential to conspiracy under the Sherman Act. Among other cases counsel cite United States v. Winslow, 227 U.S. 202, 33 S.Ct. 253, 57 L.Ed. 481; United States v. United Shoe Mach. Co., 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968; United States v. General Electric, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; Alexander Milburn Co. v. Union Carbide & Carbon Corp., 4 Cir., 15 F.2d 678, certiorari denied 273 U.S. 757, 47 S.Ct. 459, 71 L.Ed. 876; and Arthur v. Kraft-Phenix Cheese Corp., D.C., 26 F. Supp. 824.

■ This reasoning fails mainly because it assumes that the General Motors dealer is an agent of the manufacturer or, stated differently, because it considers the commerce from factory to retail public as the appellants' commerce rather than as the dealers' commerce. Clearly a vertical combination or combination of non-competitors may conspire to restrain unreasonably the interstate trade and commerce of third parties and thereby subject themselves to the prohibitions of the Sherman Act. Loewe v. Lawlor, supra, 208 U.S. 293–296, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann. Cas. 815; United States v. Patten, supra, 226 U.S. 541, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325; Patterson v. United States, 6 Cir., 222 F. 599, 618, 619.

■ Nor can the appellants enjoy the benefits of separate corporate identity and escape the consequences of an illegal combination in restraint of trade by insisting that they are in effect a single trader. The test of illegality under the Sherman Act is not so much the particular form of business organization effected, as it is the presence or absence of restraint of trade and commerce. But even if the single trader doctrine were applicable, it would not help the appellants. See International Business Machines v. United States, supra; Radio Corporation v. Lord, supra. See also Dr. Miles Medical Co. v. Park & Sons Co., supra. Cf. Carbice Corp. v. American Patents, supra; dissent, Federal Trade Commission v. Gratz, supra, 253 U.S. 441, 40 S.Ct. 572, 64 L.Ed. 993.

This disposes of all the cases cited by counsel for the appellants except the Kraft-Phenix case which is distinguishable on the ground that only one dealer was affected and neither the interest of a third party nor the interest of the public was involved.

2. Exclusion of Evidence. It is argued that the Court committed prejudicial error when it excluded the testimony of dealer witnesses called by the defendants and cut off the calling of additional dealer witnesses. The appellants offered to call all General Motors dealers, not called by the Government, to testify that they had not been discriminated against and coerced into using the facilities of GMAC.

The position of the appellants on this point is that they offered the excluded evidence to refute the Government's evidence showing that there was a conspiracy. As stated by counsel for GMAC and GMAC (Ind.), "We did not offer our dealer testimony to refute the testimony of the Government's dealer witnesses * * * we offered it to refute the inference which otherwise might have been drawn from the testimony of the Government's dealer witnesses that the defendants had agreed upon the course of conduct represented by their treatment of those dealers."

■ In our case restraints of trade were inherent in the purpose to control the dealers' financing and this purpose, regardless of the intent or means, came within the prohibition of the Sherman Act. Moreover the Government was not obliged to adduce any evidence of acts and things done pursuant to the conspiracy, and proof of the conspiracy would have been sufficient

to sustain a conviction even if the conspiracy had never been carried out. This is true because the offense condemned by the Sherman law is the act of conspiring, and neither actual restraints nor overt acts need be proved. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 252, 60 S.Ct. 811, 84 L.Ed. 1129. Even so, the Government adduced dealer testimony to show the nature of the conspiracy and to evidence overt acts necessary to jurisdiction.

Obviously, in proving the conspiracy, it was not necessary to show that all dealers in fact had been discriminated against or coerced. For that matter, it was shown in parts B and C that the Government had introduced ample evidence to indicate that a nation-wide conspiracy had been formed, quite apart from the dealer testimony or other such testimony relating to acts and things done pursuant to such conspiracy, and that the dealer body as a whole had become acutely aware of appellants' policy requiring the use of GMAC financing facilities. Consequently, since the indictment did not charge that the appellants actually restrained trade but that they "conspired" to restrain trade, it was not necessary for the Government to show that a single dealer had in fact been discriminated against or coerced.

█ The basic issue was whether the appellants had conspired to restrain the trade and commerce of dealers. It was proper for the Court to exclude all evidence not relevant to the issue or merely remotely relevant to the issue. The excluded evidence or offers of proof consisted of the failure of appellants' dealer witnesses to experience coercive treatment at the hands of the appellants. Such evidence was not logically relevant to the issue and had no rational tendency to resolve the question of conspiracy. At the most the excluded dealer evidence of non-coercion was only remotely connected to the issue of conspiracy to restrain the trade of dealers and hence of little probative value.

Indeed it is manifest that a showing of non-coercion in one instance does not disprove an affirmative showing of coercion in another instance. In addition the offers of proof failed to show that the appellants' dealer witnesses had knowledge of the treatment accorded other dealers or that a similarity of circumstances otherwise existed as between them and the Government's dealer witnesses. See Derango v. United States, 6 Cir., 18 F.2d 778; Shaw v. United States, 5 Cir., 41 F.2d 26; Small v. Pennsylvania R. Co., 65 App.D.C. 112, 80 F.2d 704, 707; Sharples Separator Co. v. Skinner, 9 Cir., 251 F. 25; Johnstown Tribune Pub. Co. v. Briggs, 3 Cir., 76 F.2d 601. Apparently these are the reasons why counsel did not ground relevancy of the offered evidence on the theory that it would tend to refute the Government's dealer testimony.

Nor as a matter of logic does it change matters to ground relevancy of the offered evidence on the theory that it tends to refute the Government's evidence showing that a conspiracy to restrain the trade of dealers had been formed. If the excluded testimony fails to refute the Government's evidence of coercion, it is difficult to conceive how it would refute the Government's evidence showing that a conspiracy had been formed and that some overt acts of coercion had occurred in pursuance thereto. Even more so, it is difficult to imagine how testimony of non-coercion would refute the Government's evidence showing that a conspiracy had been formed, quite apart from acts of coercion done pursuant to such conspiracy.

Stated differently, evidence that the appellants had not restrained the commerce of some dealers would not prove that there was no conspiracy to restrain the commerce of dealers. Neither can such evidence disprove the affirmative evidence that they had restrained the trade of many dealers. Nor a fortiori can such evidence disprove the affirmative evidence that a conspiracy to restrain the trade of dealers had been formed. We are satisfied that the excluded testimony was purely negative in character and that its probative effect on the issue of conspiracy was remote and inconsiderable at the most.

The appellants rely on Worthington v. United States, 7 Cir., 64 F.2d 936, 941, a case decided by this Court, as authority for their contention that they had a right to call all the dealers not called by the Government to show by negative testimony the nonexistence of the conspiracy. We believe the Worthington case is distinguishable, primarily for the reasons stated below. In the Worthington case the defendant was charged with using the mails in executing a scheme to defraud, the scheme being grounded on the sale of purportedly worthless land. The basic matter in dis-

pute was the value of certain "lots in the same addition" and the excluded testimony was positive in character, tending to prove the affirmative fact that the lots had value and refuting the Government's evidence that the lots were worthless.

■ It is also argued that the Court committed prejudicial error when it excluded testimony relating to the rates and practices of other finance companies. In particular the offers of proof indicated that GMAC rates were lower than those of other discount companies and that such companies permitted practices inconsistent with good merchandising of automobiles.

The case was tried on the theory that appellants had formed a conspiracy in restraint of the dealers' interstate trade and commerce. The Government introduced evidence showing the existence of the conspiracy, the purpose and object to monopolize the finance business, and the means adopted to carry out the conspiracy. The appellants adduced evidence tending to refute the evidence of the Government, but the jury resolved the conflict against the appellants. The evidence disclosing the intimate relation between finance and commerce was not disputed.

Such was the nature and object of the conspiracy that by its necessary operation, as clearly evidenced by the overt acts of coercion and discrimination, it would directly and unduly impede and burden the interstate trade and commerce of the dealers in General Motors cars. In the nature of things the finance restrictions would inevitably operate to limit the number of General Motors cars purchased and sold by the dealers, affect the dealers' ability to secure cars, hinder the movement of these cars generally, discriminate against dealer-purchasers and retail purchasers of these cars, and cause hardships to the dealers and to retail purchasers who could not or would not use the GMAC service.

■ We are convinced that the offered evidence was not logically relevant to any of the controverted issues in the case and hence was properly excluded. Manifestly the evidence related more to the possible motives or reasons inspiring the conspiracy, than to the effect which the imposition of the finance restrictions would have on the dealers' commerce in General Motors cars. When persons conspire to impose a direct restraint on interstate commerce, benevolent motives or the activities of third parties do not save them from crim-

inal prosecution for violation of the Sherman law. See United States v. Socony-Vacuum Oil Co., supra.

■ Consequently, the inadmissibility of the offered evidence may be grounded on the theory that the activities of third parties cannot justify the defendants' violation of law. See Hills Brothers v. Federal Trade Commission, 9 Cir., 9 F.2d 481, 485. Or inadmissibility may be grounded on the theory that evidence of benevolent motives or good intention is immaterial where the operation of the conspiracy, and the specific acts and things done pursuant thereto, necessarily result in a direct restraint of interstate commerce. United States v. Patten, supra, 226 U.S. 543, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325.

■ During the course of the trial the appellants introduced evidence tending to show that the inspiration or motivation for their financing activities was the protection of GMC, General Motors dealers and the buying public from evils inherent in uncontrolled financing of car sales. There was also evidence bearing on the reasonableness of GMAC rates, while at various times testimony pointing to the relative superiority of GMAC rates and terms crept into the record. In this sense much of the refused testimony was cumulative in character and it follows that the exclusion of such testimony, even if not wholly irrelevant to the issues, was a matter within the Court's discretion.

The appellants cite Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, as authority for their contention that the offered evidence was admissible. In that case evidence of intent was material, for the Government had not shown the actual or probable effect of the restraint upon interstate commerce. Consequently, the evil believed to exist, the reason for adopting the particular remedy, might have helped the court "to interpret facts and to predict consequences." But in our case evidence of good intention, of activities of third parties and of benevolent motives would have availed the appellants nothing. By purposely engaging in a conspiracy which necessarily operated to produce a direct restraint upon interstate commerce, they had become chargeable with intending that result. See United States v. Patten, supra, 226 U.S. 543, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325. They also reason from language in United States v. Socony-

Vacuum Oil Co., supra, 310 U.S. 217, 60 S.Ct. 811, 84 L.Ed. 1129, that the holding in the Board of Trade case is applicable in all cases except where a price-fixing arrangement, as distinguished from all other types of restraints, is alleged and proved. Such reasoning finds no basis in the Socony-Vacuum opinion. See also the dissent, Apex Hosiery Co. v. Leader, supra, 310 U.S. 517, 518, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

■ The appellants also objected to the exclusion of evidence relating to the nature of the "hectic conditions" prevailing in southern California in 1925. This evidence was offered for the purpose of showing that automobile finance conditions in the Los Angeles area justified the position taken by the conference executives that dealers use GMAC finance facilities. The appellants were not justified in remedying the extremely competitive situation existing at that time by resort to unlawful activities. Sugar Institute v. United States, 297 U.S. 553, 599, 56 S.Ct. 629, 80 L.Ed. 859. The instant case is one of involuntary restraint of interstate commerce, direct and unreasonable, and hence evidence of motive or justification is not material. Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788. Moreover, much of the refused evidence was merely cumulative in character.

The appellants also complain of various rulings which limited, in certain particulars, the cross-examination of several Government witnesses. We have examined the instances referred to by the appellants, and we believe that the rulings neither affected matters of substance nor exceeded the discretionary power vested in a trial court to limit the cross-examination to the subject-matters of the direct examination.

We hold, in conclusion, that the Court did not commit error, certainly not prejudicial error (1) in excluding the dealer testimony offered by the appellants, (2) in excluding evidence relating to the charges and practices of other finance companies, and (3) in limiting the cross-examination of certain Government witnesses in certain particulars.

3. Inclusion of Evidence. The appellants contend that the Court erred in admitting certain evidence offered by the Government, including (1) evidence of restraints prior to the three-year statutory period or indictment period which began on May 26, 1935, (2) evidence relating to activities of agents and employees of sales organizations existing prior to the organization of GMSC on December 1, 1936, (3) evidence relating to losses sustained by dealers upon liquidation, (4) evidence relating to the forcing on dealers of cars, parts, tools and accessories, and (5) evidence relating to miscellaneous incidental matters.

Counsel argue that the admissibility of the evidence in classes (1) and (2) was improper because it bore no relation to the conspiracy charged in the indictment. This argument is based on the theory that the interstate commerce alleged to have been restrained was that shipped by GMSC, which did not come into existence until December 1, 1936. Appellants add that this case is simply one of charging them with one offense and convicting them of another. On the other hand, the Government invokes the doctrine of continuing conspiracy and reasons that the commerce alleged to have been restrained was the commerce shipped by GMSC after December 1, 1936, and by the predecessor sales agents of GMC prior to that date.

Paragraph 34 of the indictment charges that "continuously for many years heretofore [that is, prior to May 27, 1938] * * said defendants and other persons and corporations to the Grand Jurors unknown, unlawfully have engaged in a conspiracy in restraint of the aforesaid trade and commerce among the several states" in General Motors cars. We have shown elsewhere that the phrase "the aforesaid trade and commerce" referred to the interstate commerce in General Motors cars from the factory through the dealers to the retail public. The inquiry now goes to the questions of continuing conspiracy and of what interstate commerce is involved.

The indictment charges that the defendants and other persons unknown to the Grand Jury conspired to restrain commerce in cars "continuously for many years" prior to the return date of the indictment. At the trial the Government introduced evidence tending to show that the conspiracy in question had been formed in 1925 and had continued to the return date of the indictment on May 27, 1938. The Court charged the jurors that "The Government is permitted to go back indefinitely to show the conspiracy, but there can be no conviction for a conspiracy unless it is shown to

have existed within three years prior to return of the indictment, or unless acts were performed in furtherance of it within that period." In addition the Court instructed them that "the corporate organization of these defendants has changed. * * * Some of them came into existence late. * * * A conspiracy may vary in its membership from day to day * * * but every person who joins a conspiracy after its formation * * * becomes liable as a conspirator. * * *"

It also developed in the course of the trial that the phrase in the indictment reading "other persons and corporations to the Grand Jurors unknown" included the former selling companies, their officers and employees. Thus, prior to December 1, 1936, these sales companies acted as the selling agents of GMC and after December 1, 1936 GMSC succeeded them as the exclusive selling agent of GMC. Moreover, prior to December 1, 1936, the selling agents of GMC and their personnel engaged in activities connected with the conspiracy which had been formed in 1925, and after December 1, 1936, GMSC and its personnel carried on the same or similar activities connected with the conspiracy. In addition, it appears that most of the officers and employees of the predecessor selling agencies merely transferred to the new corporation in 1936 and thereafter continued the same activities complained of in the indictment.

To us the matter recited in the three preceding paragraphs spells out a continuing conspiracy and undermines the theory that the commerce alleged in the indictment is confined to that shipped by GMSC after December 1, 1936. This result is inevitable if the indictment is read fairly and in its entirety, if weight is given to the words "continuously for many years," and if the selling agencies and their personnel are included in the list of "other persons and corporations to the Grand Jurors unknown."

■ Hence the evidence in class (1) was properly admissible, for it is permissible to go back of the statutory period to show a continuing conspiracy. Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450, Ann.Cas.1914C, 128; Jelke v. United States, 7 Cir., 255 F. 264; Scerba v. United States, 2 Cir., 61 F.2d 1009. And it follows that the evidence in class (2) was properly admissible, for it related to the acts and declarations of co-conspirators made while the conspiracy was active. Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918B, 461; Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409. Such evidence binds all the conspirators, even though the co-conspirators have not been indicted. Clune v. United States, 159 U.S. 590, 16 S.Ct. 125, 40 L.Ed. 269; Delaney v. United States, 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462. Nor can GMSC escape similar treatment because it joined the conspiracy subsequent to its formation. Marino v. United States, 9 Cir., 91 F.2d 691, 696, 113 A.L.R. 975; McDonald v. United States, 8 Cir., 89 F.2d 128, 133.

■ The appellants rely upon United States v. Denicke, C.C., 35 F. 407, and Naftzger v. United States, 8 Cir., 200 F. 494, as authority for the argument that they cannot be charged with one offense and convicted of another. They also rely upon Asgill v. United States, 4 Cir., 60 F.2d 780, and United States v. Philadelphia & Reading R. R. Co., D.C., 232 F. 953. These cases are inapplicable, because the first two deal with variance between indictment and proof and the last two relate to the legal sufficiency of the indictment. It is observed that there is no variance between the interstate commerce charged to have been restrained and that proved at the trial.

■■ The appellants objected to the evidence in classes (3) and (4) on the ground that it had not been charged in the indictment. As a matter of fact, the evidence relating to losses upon liquidation was fully covered in paragraph 70 of the indictment, and the evidence pertaining to the forcing of unordered cars was admissible under paragraph 52 of the indictment. It is true that the forcing of tools, equipment and accessories was not specifically alleged in the indictment, but it is reasonable to conclude that this form of discrimination was sufficiently alleged in the catch-all clause found in paragraph 34 of the indictment. In any event this evidence would have been admissible on the theory that the Government is not necessarily limited in its proof in conspiracy cases to the particular means alleged in the indictment. See United States v. Socony-Vacuum Oil Co., supra, 310 U.S. 250, 60 S. Ct. 811, 84 L.Ed. 1129; Patterson v. United States, supra, 222 F. 642, 643.

The appellants objected to the evidentiary matters constituting class (5) on such grounds as hearsay, irrelevancy and immateriality. Illustrative of this evidence is that in the form of certain exhibits which contained statements by GMAC field representatives to their superiors. They found this evidence particularly objectionable as hearsay, since the field men making the reports were not called to identify them. Yet these reports were admissible under 28 U.S.C.A. § 695, 49 Stat. 1561, as recorded acts or transactions made in the regular course of business.

Most of the errors assigned in connection with this class of evidence were not argued, and the appellants admitted that none of the miscellaneous matters were prejudicial in and of themselves, reasoning however that their cumulative weight might "very well have had a profound effect on the jury." Our consideration of this evidence, treated either in isolation or in its entirety, leads to the conclusion that admissibility was not improper and that the appellants could not possibly have been prejudiced or injured by its presence in the record.

4. Jury Instructions. Appellants insist that the Court erred in (1) rejecting a compact group of requested instructions tendered prior to submission of the case to the jury, in (2) failing to clarify for the jury the basic issue of restraint in interstate commerce, in (3) refusing to charge as requested on matters relating to the power of the appellants to restrain the trade in General Motors cars, and in (4) refusing to strike from its charge a statement illustrating that the character of the restraint rather than the amount of commerce involved is the criterion of reasonableness under the Sherman Act.[4]

At the close of the trial the Government and the defense submitted written requests for instructions. In fact the appellants presented the Court with a document containing some 223 requested charges and covering 91 typewritten pages. The Court rejected the requests as a whole and charged the jury in simple narrative style. In this connection the Court explained that it refrained "except as a last resort, always, from giving to the jury formal charges which become so involved in legal language and legal terms as to be of little aid to the jury." After delivering the charge the Court requested the parties to point out errors or omissions, if any. This the appellants proceeded to do, and all specific explanations, corrections or instructions were granted except specific requests (3) and (4) above.

In preparing his charge to the jury a trial court may find some comfort in suggestions and requests offered by the parties, but in the end the form the charge assumes, the contents thereof and the manner of its delivery are matters solely within the discretion of the court. Nor does a failure to read or to consider offered instructions, necessarily result in an improper charge upon which injury may be based. It would appear therefore that a trial court is not obligated to go through all the requests and offered instructions in order to see whether they have been covered in his charge. Especially is this true where the offered instructions are numerous and where the parties are given an adequate opportunity to point out specific errors and omissions and to make requests for specific additional charges. This view was taken in Hamburg-American Steam Packet Co. v. United States, 2 Cir., 250 F. 747, and we endorse and accept as pertinent here the language used in page 769 of that opinion. Certainly the explanation given by the Court for his rejection of the requested instructions is very plausible and the action taken in the whole matter is fully consistent with judicial propriety. We are satisfied that assigned error (1) need not be given further consideration.

---

[4] Assigned error (3) relates to a refusal to charge the jurors that "if they find that the defendant corporations together constitute a single co-operative enterprise, in the course of which defendant corporations do not compete with one another, that there is and can be no unlawful agreement among them to restrain trade and commerce among the states, in automobiles."

Assigned error (4) relates to a refusal to strike the following statement from the charge to the jury: "If a group of Indiana farmers, or two Indiana farmers, should stop a truck coming from Illinois loaded with corn because they did not want any Illinois corn in Indiana and prevent its entry, that is an unreasonable interference with interstate commerce, although it involves only one truckload of corn."

■ The charge to the jury has been condensed and discussed in part A, and we do not intend at this time to repeat what was said there. It is necessary, however, in connection with assigned error (2), to observe that the complete charge consisted of an original charge and of a supplemental charge. We are inclined to agree with the appellants that the Court had failed in the original charge to clarify for the jury the issue of restraint of interstate commerce. In any event, the jury soon requested further instruction on that very issue, and in the supplemental charge this issue was elucidated upon and clarified. We think that the whole charge, considered in its entirety, served its purpose admirably and presented the case fairly and accurately. In fact, we can only conclude by saying that the conduct of the Court in this important phase of the trial was exceptionally fair to both sides and deserves praise and commendation rather than complaint.

■ The specific charge requested by the appellants which constitutes assigned error (3) and is quoted in full in footnote 4, amounted in practical effect to a request that the jury be directed to find the appellants legally impotent to restrain the trade and commerce in General Motors cars. It has been shown as a matter of law that the appellants are separate entities, even though as a matter of economics they may constitute a single integrated enterprise, and that they are not impotent to restrain the trade and commerce of the dealers in General Motors cars. Consequently, the Court was not obliged to give such an instruction.

■ Nor do we believe that it was error to refuse to strike the statement quoted in footnote 4. The story of the two Indiana farmers was given to illustrate the proposition that the character of the restraint and not the volume of commerce restrained, was the proper yardstick under the Sherman Act. This story was preceded by a paragraph stating that "we are not necessarily limited in our solution of this question by the amount of commerce involved," and immediately followed by a paragraph charging that "It is not a question of size when you come to determine whether a thing is reasonable or not. Size or quantity may be one of the elements that you may consider, but whether a thing is unreasonable depends upon the character of the acts proved." In this regard the Court's charge is supported by United States v. Socony-Vacuum Oil Co., supra, 310 U.S. 225, footnote 59, 60 S.Ct. 811, 84 L.Ed. 1129; Apex Hosiery Co. v. Leader, supra, 310 U.S. 485, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. Certainly we do not attach any peculiar significance or enduring consequence to the illustration because of its "homespun nature," as apparently the appellants do, nor do we deem it reasonable at all to attribute to the example any quality of prejudice.

We conclude that the Court committed no error either in its specific charges to the jury or in its refusal to charge as requested.

5. *Other Matters.* It is further contended that the Court erred in denying certain motions made by the appellants before, during and after the trial. In particular the assigned errors relate to (1) the demurrer to the indictment, (2) the motion for a bill of particulars, (3) the motion to dismiss at the close of the Government's opening statement, (4) the motion for a directed verdict and (5) the motion for a new trial.

In part A we discussed at great length the fundamental theory of the prosecution, and included therein a consideration of the indictment, which consists of 72 paragraphs and goes into detail with respect to the matters charged and how they were to be accomplished. In part B we related the evidence contained in the record. In part C we demonstrated the sufficiency of the evidence. In part D we showed that the facts alleged in the indictment and proved in the course of the trial, stated a cause of action under the Sherman law.

■■ Appellants demurred to the indictment generally because of legal insufficiency and specially because of indefiniteness and uncertainty, and complained of the refusal to grant a bill of particulars because of the large number of transactions between the appellants and General Motors dealers. The demurrer was properly overruled and the motion for particulars was properly denied, for the reasons appearing in the preceding paragraph. No more need be said in connection with these points except that the indictment fully and expressly set forth all the elements necessary to constitute the offense and sufficiently apprised the appellants of what they would be prepared to meet. Obviously the sufficiency of the evidence described in part C disposes of the motions for direct-

ed verdict, and we are convinced there was no error in refusing to dismiss the indictment at the close of the Government's opening statement.

■■■ The jury convicted the appellants, but acquitted the individual defendants. It is well settled that corporations may violate the Sherman law by forming a conspiracy in restraint of interstate commerce, but it is fundamental that they could do this only through individual agents. As their last ground of appeal the appellants assert that the verdict was inconsistent, and contend that the Court should have granted a new trial.

We can not understand how the jury could have acquitted all of the individual defendants. As a matter of logic, reconciliation between the verdict of guilt and verdict of acquittal is impossible. Perhaps an explanation may be constructed on the jury charge that "You have a right in considering this cause to find all the defendants guilty, to find them all not guilty. You have a right to find part of them guilty and part of them not guilty."

There is authority holding that a corporation may be convicted of unlawful conspiracy despite the acquittal of persons through whom it could have conspired and without whom the success of the conspiracy would have been impossible. United States v. Austin-Bagley Corp., 2 Cir., 31 F.2d 229. It is arguable that the individuals acquitted in that case did not exhaust the list of agents who had been indicted, and that the acquitted agents were not necessary to the existence of the conspiracy even though they were indispensable to the execution of the conspiracy. However, the language of the opinion does not appear to turn the case on the argument just advanced, nor do we think the case should so be turned.

■■■ The question on review should not be whether the verdict against the corporations is consistent with the acquittal of the individuals. Rather it should be whether the conviction is consistent with the evidence. In other words, we believe that the acquittal of the officers and agents, even if they had been the only persons through whom the corporations could have acted, should not operate without more to set aside the verdict against the corporations. Nor do we attach significance to the argument that the problem of inconsistent verdict in the instant case presents a different problem than that when the verdicts upon two counts are inconsistent. See Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; United States v. Meltzer, 7 Cir., 100 F.2d 739, 741. In fact we believe that the same rule is applicable, that consistency in a verdict is not required, and that the language in the Austin-Bagley case supra tends in that very direction.

■■■ In any event it is conceded that although a corporation acts only through its agents, their indictment is not a condition precedent to prosecution against the corporation. The appellants insist, however, that in this case the individual defendants did in fact exhaust the list of agents and officers who could have been responsible for the acts and policies of the corporation, and that hence "their acquittal must mean that no agent acted unlawfully in behalf of the appellants." On this phase of the matter the following observations are relevant. The loss of the individual defendants was not fatal to the indictment as it charges that there were other persons to the grand jurors unknown who participated in the conspiracy. And at the trial it developed that the unnamed co-conspirators included a large number of officers and agents in addition to those named, who were also responsible for the acts and policies of the corporations convicted. It is apparent, therefore, that the acquittal did not exhaust the list of agents who could have been and were responsible for the acts and policies of the appellants.

■■■ In substance the appellants seek to make a case for setting aside the verdict on what appears to be either jury mistake or jury leniency operating to their advantage. We hold that the Court's action in denying the motion for a new trial was proper and lay safely within the boundaries of sound judicial discretion.

This concludes our disposition of the grounds on appeal. The judgment of conviction is affirmed.

### Petition for Rehearing.

■■■ Our position on the single trader issue does not destroy the principle that a trader has the right to select his own customers. United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443. Because GMC is not bound to sell General Motors cars, it does not follow that in the case of sales actually made, it

**412**

may impose the restriction in question upon its purchasers and sub-purchasers. The restriction bears no reasonable relation to manufacturer's goodwill in automobiles, limits unduly the liberty of General Motors dealers to engage in business, prevents the free negotiation of retail sales, and enables the car manufacturer to increase the sales of another article without any apparent advantage to the public.

 The opinion did not ignore the point made by appellants that the restraint on the commerce in cars was merely incidental to the accomplishment of the purpose to stimulate car sales. There was some evidence that the commercial purpose was the promotion of car sales, but on this record it would have been surprising had the jurors accepted it. Undoubtedly sound financing is essential to the proper movement of cars in the channels of trade. Admittedly GMAC financing is sound, but there is no contention that it is sui generis or the sine qua non of sales stimulation. At the most the promotion of car sales or the protection of goodwill in automobiles would have required dealers' adherence to sound financing. Resort to the excessive means of record points unmistakably to a purpose other than the one asserted by the appellants. Unquestionably the dominant purpose was to stimulate GMAC finance sales.

The case of Apex Hosiery Co. v. Leader, 310 U.S. 469, 512, 60 S.Ct. 982, 1002, 84 L.Ed. 1311, 128 A.L.R. 1044, announced the view that the Sherman Act is not directed at restraints "which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to 'monopolize the supply, control its price, or discriminate between its would-be purchasers.'" We are aware that this recent view of the Supreme Court throws a new light on the precedents, but we see no reason for changing our conclusions in this matter or for reconsidering anything we have said in the opinion. The intent of the appellants, or the necessary result or operation of their conspiracy, was the complete market control of the dealers' commerce in General Motors cars. The GMAC finance restriction operated to discriminate between "would-be purchasers" of General Motors cars, and obviously interfered with the competitive forces that otherwise would control the marketing of these cars.

The petition for rehearing is denied.